CASE NO. 22-1322

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

| | |
|---|---|
| MARTA SANCHEZ, et al., | ) |
| | ) |
| *Plaintiffs-Appellants*, | ) |
| | ) |
| v. | ) |
| | ) |
| ANTHONY GUZMAN, et al., | ) |
| | ) |
| *Defendants-Appellees*. | ) |

---

On Appeal from the United States District Court
for the District of Colorado – Denver
The Honorable Judge Regina V. Rodriguez
D.C. No. 1:19-cv-01871-RMR-MEH

---

## APPELLANTS' OPENING BRIEF
[ORAL ARGUMENT REQUESTED]

---

Respectfully submitted,

Robert E. Barnes
BARNES LAW
700 S. Flower Street, Suite 1000
Los Angeles, CA 90017
Telephone: (310) 510-6211
Email: robertbarnes@barneslawllp.com

*Attorneys for Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................iv

PRIOR OR RELATED APPEALS........................................................... ix

INTRODUCTION ……………………………………………………………1

STATEMENT OF JURISDICTION........................................................2

STATEMENT OF THE ISSUES..............................................................4

STATEMENT OF THE CASE..................................................................5

SUMMARY OF THE ARGUMENTS .....................................................6

STANDARD OF REVIEW ......................................................................7

ARGUMENT ..........................................................................................10

    I.   THE DISTRICT COURT ERRED BY RULING THAT APPELLANTS
       HAD THE BURDEN OF PROVING APPELLEE OFFICERS WERE
       NOT ENTITLED TO QUALIFIED IMMUNITY …………………..11

    II.  THE DISTRICT COURT FURTHER ERRED BY RULING THAT
       APPELLANTS BORE THE BURDEN OF PRODUCING PRECEDENT
       IN AN ANALOGOUS TYPE OF CASE, WITH ANALOGOUS FACTS,
       IN ORDER TO OVERCOME QUALIFIED IMMUNITY ....................18

    III.THE DISTRICT COURT FURTHER ERRED IN FINDING
       APPELLANTS' CLAIMS WERE BARRED BY QUALIFIED
       IMMUNITY, BECAUSE INSUFFICIENT AUTHORITY SHOWING
       THE CONSTITUTIONAL VIOLATIONS ASSERTED WERE
       "CLEARLY ESTABLISHED", WAS PRODUCED ………………….28

CONCLUSION .......................................................................................34

STATEMENT OF COUNSEL AS TO ORAL ARGUMENT …………………...35

CERTIFICATE OF COMPLAINCE ……………………………………………..36

CERTIFICATE OF DIGITAL SUBMISSION …………………………………..37

CERTIFICATE OF SERVICE ……………………………………………………...38

ATTACHMENTS [10th Cir. R. 28.2(C)(5)] …………………………………...39

    Recommendation of United States Magistrate Judge [Dkt. 179]  ………...A1

    Order Adopting Recommendation Of United States Magistrate Judge [Dkt. 184] …………………………………...................................................A29

    Final Judgment of Dismissal [Dkt. 185] ……………………….......A52

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Alexander v. Alexander*,
706 F.2d 751 (6th Cir. 1983) …………………………………………...13

*Allen v. City & County of Honolulu*,
39 F.3d 936 (9th Cir. 1994) ………………………………………….24

*Anderson v. Creighton*,
483 U.S. 635 (1987) …………………………………………………...19

*Ashcroft v. al-Kidd*,
563 U.S. 731, 131 S.Ct. 2074 (2011) ………………………………21

*Bailey v. Pataki*,
708 F.3d 391 (2nd Cir. 2013) ………………………………………..23

*Barrett v. Thompson*,
649 F.2d 1193 (5th Cir. 1981) …………………………………………15

*Bauer v. Norris*,
713 F.2d 408 (8th Cir. 1983) …………………………………………...16

*Benigni v. City of Hemet*,
879 F.2d 473 (1988) …………………………………………………...14

*Buckley v. Rogerson*,
133 F.3d 1125 (8th Cir. 1998) ………………………………………24

*Carr v. Castle*,
337 F.3d 1221 (10th Cir. 2003) ………………………………………...30

*Casey v. City of Federal Heights*,
509 F.3d 1278 (10th Cir. 2007) ………………………………………...21

*Cavanaugh v. Woods Cross City*,
625 F.3d 661 (10th Cir. 2010) ………………………………………….32

iv

*Chavis v. Rowe*,
     643 F.2d 1281 (7th Cir.) …………………………………………..16

*DeNieva v. Reyes*,
     966 F.2d. 480 (9th Cir. 1992) …………………………………..15

*DeVasto v. Faherty*,
     658 F.2d 859 (1st Cir. 1981) …………………………………...15

*Dodds v. Richardson*,
     614 F.3d 1185 (10th Cir. 2010) ………………………………….8

*Estate of Booker v. Gomez*,
     745 F.3d 405 (10th Cir. 2014) ……………………………22-23, 30

*Estate of Valverde v. Dodge*,
     967 F.3d 1049 (10th Cir. 2020) ………………………………….8

*Fancher v. Barrientos*,
     723 F.3d 1191 (10th Cir. 2013) ………………………………….7

*Garramone v. Romo*,
     94 F.3d 1446 (10th Cir. 1996) …………………………………..19

*Gomez v. Toledo*,
     446 U.S. 635, 100 S.Ct. 1920 (1980) …………………6, 11-12, 15, 17

*Gray v. Bell*,
     712 F.2d 490 (D.D.C. 1983) …………………………………..12

*Harlow v. Fitzgerald*,
     457 U.S. 800, 102 S.Ct. 2727 (1982)................6, 10-12, 14-15, 17, 21

*Harris v. City of Circleville*,
     583 F.3d 356 (6th Cir. 2009) …………………………………...30

*Hicks v. Feeney*,
     770 F.2d 375 (3rd Cir. 1985) …………………………………..23

*Hope v. Pelzer*,
     536 U.S. 730, 122 S. Ct. 2508 (2002) …………………………...20-22

*J.H.H. v. O'Hara*,
    878 F.2d 240 (8th Cir. 1989) …………………………………………...24

*Mayfield v. Bethards,*
    826 F.3d 1252 (10th Cir. 2016) …………………………………………19, 29

*McGhee v. Draper,*
    564 F.2d 902 (10th Cir. 1977) …………………………………………….13

*Melton v. City of Okla. City*,
    879 F.2d 706 (10th Cir. 1989) …………………………………………….20

*McDonald by McDonald v. Haskins,*
    966 F.2d 292 (7th Cir. 1992) …………………………………………...23

*Morris v. Noe,*
    672 F.3d 1185 (10th Cir. 2012) …………………………………………...22

*Mullenix v. Luna,*
    577 U.S. 7 (2015) …………………………………………………...26

*Pauly v. White,*
    814 F.3d 1060 (10th Cir. 2016) …………………………………………...20

*Pearson v. Callahan*,
    555 U.S. 223 (2009) …………………………………………………10, 23

*Ringuette v. City of Fall River,*
    146 F.3d 1 (1st Cir. 1998) …………………………………………...12

*Roska ex rel. Roska v. Peterson,*
    328 F.3d 1230 (10th Cir. 2003) …………………………………………...25

*Sample v. Bailey,*
    409 F.3d 689 (6th Cir. 2005) …………………………………………...23

*Saucier v. Katz,*
    533 U.S. 194, 121 S.Ct. 2151 (2001) ……………………………………23

*Schechter v. Comptroller of City of New York,*
    79 F.3d 265 (2nd Cir. 1996) ……………………………………………12

*Tanner v. Hardy*,
    764 F.2d 1024 (4th Cir. 1985) …………………………………………….15

*Tennessee v. Garner*,
    471 U.S. 1, 105 S.Ct. 1694 (1985) ………………………………29-31

*Thomas v Independence Township*,
    463 F.3d 285 (3rd Cir. 2006) …………………………………………...15

*Tolan v. Cotton,*
    572 U.S. 650, 134 S. Ct. 1861 (2014) ………………………………26

*United States v. Lanier,*
    520 U.S. 259, 117 S.Ct. 1219 (1997) ……………………..7, 18, 21, 29

*Vette v. K-9 Deputy Sanders,*
    989 F.3d 1154 (10th Cir. 2021) …………………………………...32

**Statutes and Rules:**

28 U.S.C.,

    § 1291 …………………………………………………………...3

    § 1294 …………………………………………………………...3

    § 1331 …………………………………………………….......3

    § 1343 …………………………………………………………...3

    § 1367 …………………………………………………………...3

42 U.S.C.,

    § 1981 …………………………………………………………...3

    § 1983 ..................................................................................3

    § 1988 …………………………………………………………...3

Colorado Revised Statutes,
    §§ 13-201 and 13-202 ……………………………………………..3

Federal Rules of Appellate Procedure,

    Rules 3 and 4 …………………………………………………4

    Rule 28(a)(4) ........................................................................2

Federal Rules of Civil Procedure,
    Rule 8(c) …………………………………………………..12

**Other Authorities:**

Nahmod, *Civil Rights & Civil Liberties Litigation: The Law of Section 1983*
    (2022) …………………………………………………...13, 22

C. Wright & A. Miller, *Federal Practice and Procedure* (1969) .......... 12, 13

## PRIOR OR RELATED APPEALS

There are no prior or related appeals in this action.

## INTRODUCTION

Police officers protect our land by bravely facing life-threatening dangers without hesitation every day. As a group, they should be granted special defenses by the courts when they act in defense of the public and themselves, including in certain situations resulting in damage and destruction. However, this deference is not, and must not, be unlimited. Because in the absence of accountability for an officer's unreasonable use of violence causing death, harm or unjust suffering to our citizens, a given police officer simply becomes a wild west vigilante.

This is an appeal of the dismissal of civil rights claims against police officers who fired 66 shots into a car occupied by three persons at three different stop locations. One of the occupants was killed, the other rendered para-paraplegic and the third seriously injured because he exited the vehicle after the first stop to flee. This appeal seeks reversal of a district court's dismissal of their claims, on the grounds the action should not be decided by a jury, because the police officers were entitled to qualified immunity as a matter of law.

In so ruling, the district court found material disputes of fact existed, and yet imposed a burden of proof to defeat qualified immunity well over and above what judicial precedent requires. If, as ruled by the district court below, plaintiffs bringing excessive force claims have the burden of proving the defendant officers

are **not** entitled to qualified immunity, then it is no longer an affirmative defense, but effectively absolute immunity.

If, as ruled by the district court here, plaintiffs are never entitled to surrender once a pursuit has been engaged by police, which resulted in their claims being barred based on qualified immunity - then why would plaintiffs ever attempt to surrender? The district court's impossible standard in this case required the plaintiffs to produce precedent involving the same type of case and the same facts as the case at bar, where victims of excessive force tried to surrender repeatedly without success and suffered grievous injury and death. The perverse outcome of this ruling would mean a suspect may never surrender once a chase has begun, nor would any suspect have incentive to because police may lawfully continue shooting at them. The district court concluded that because the exact situation involving repeated surrender attempts and excessive officer conduct at issue never made it to the law books, then the "you can never surrender after chase" rule is now the law of the land. This appeal seeks reversal of the above-described dismissal, so that the action may be resolved where it should be, by a jury.

## STATEMENT OF JURISDICTION

Pursuant to Federal Rules of Appellate Procedure, Rule 28(a)(4), Plaintiffs-Appellants Marta Sanchez, The Estate of Stephanie Lopez and Dominic Martinez (collectively "Appellants") submit the following statement of jurisdiction:

(A)     Appellants' underlying action was a civil claim filed in the United States District Court for the District of Colorado – Denver (the "District Court"), alleging four claims against Defendants-Appellees Anthony Guzman, Luke McGrath, Joseph Carns and Brian Martinez (collectively "Appellees"). Those claims were as follows: (i) violation of the 4th and 14th Amendments to the U.S. Constitution under 42 U.S.C. § 1983; (ii) *Monell* violations under 42 U.S.C. § 1983; (iii) common law negligence; and (iv) wrongful death under Colorado Revised Statutes §§ 13-201 and 13-202. Appendix of Appellant ("App."), at 26-46.[1] The District Court had subject-matter jurisdiction over the action pursuant to 28 U.S.C. §§ 1331 and 1343; and 42 U.S.C. §§ 1981, 1983 and 1988. Supplemental jurisdiction over the state law claims arose from the same set of facts in the action, and was thereby exercised under 28 U.S.C. § 1367.

(B)     This Court has jurisdiction to hear this appeal under 28 U.S.C. §§ 1291 and 1294, as it is an appeal of a final order or judgment that disposes of all parties' claims, pursuant to the District Court's entry of two orders: (i) Order dated August 30, 2022 adopting the Recommendation of United States Magistrate Judge Michael E. Hegarty, granting Appellees' Motion for

_____

[1] There is one volume only of the Appendix of Appellant.

Summary Judgment on all remaining claims in the case (the "Order of Dismissal"). App. 205-227; and (ii) Final Judgment dated August 30, 2022, in favor of Appellees and against Appellants, dismissing Appellants' remaining claims in the case with prejudice (the "Judgment of Dismissal"). App. 228.

(C)    This appeal is timely because Appellants filed a Notice of Appeal From Final Judgment with the District Court on September 29, 2022. App. 24. Said filing was less than 30 (thirty) days after the District Court's entry of the Order of Dismissal and the Judgment of Dismissal, in compliance with Rules 3 and 4 of the Federal Rules of Appellate Procedure.

(D)    This appeal is from a final order or judgment that disposes of all parties' claims, in that the Order of Dismissal and Judgment of Dismissal dismissed all remaining claims by Appellants against all remaining parties with prejudice. App. 205-227 and 228.

## STATEMENT OF THE ISSUES

I.    Whether the District Court erred by ruling Appellants bringing Constitutional claims of excessive force against police officers, had the burden of proving the officers are not entitled to qualified immunity.

II.    Whether the District Court erred by ruling Appellants bore the burden of producing judicial precedent involving an analogous type of case, with

analogous facts to the case at bar, in order overcome qualified immunity by proving the Constitutional violation claimed was "clearly established".

III.    Whether the District Court erred in finding that qualified immunity barred Appellants' excessive force claims, because insufficient authority was produced showing it was "clearly established" that police officer Appellees firing dozens of gun shots into a motionless vehicle with unarmed surrendering occupants presenting no observable threat, violated a Constitutional right.

## STATEMENT OF THE CASE

The original complaint in this action was filed in the District Court on June 27, 2019. App. 6. On January 17, 2020, Appellants filed an Amended Complaint (the "Amended Complaint). App. 26-46.

On February 4, 2022, various defendants, including Appellees, filed motions for summary judgment. App. 20. On July 29, 2022, Magistrate Judge Michael E. Hegarty (the "Magistrate Judge") filed recommendations granting Appellees' Summary Judgment Motion (the "Recommendation"). App. 47-74. On August 12, 2022, Appellants filed objections to the Magistrate Judge's Recommendation. App. 75-204. On August 30, 2022, the District Court reviewed the Recommendation *de novo*, and adopted all of the Recommendation in full and dismissed all of Appellants' claims with prejudice by entering the Order of Dismissal and the

Judgement of Dismissal. App. 205-227 and 228. Appellants filed a timely appeal on September 29, 2022. App. 24.

## SUMMARY OF THE ARGUMENTS

The District Court committed no less than three separate and independent errors of law that merit reversal by this Court as follows:

I.   First, the District Court erroneously imposed the evidentiary burden upon Appellants, of proving that Appellees were not entitled to qualified immunity. As the Supreme Court held over forty years ago in *Harlow v. Fitzgerald*, 457 U.S. 800, 813-814, 102 S.Ct. 2727, 2736 (1982): "Qualified or 'good faith' immunity is an affirmative defense that must be pleaded by a defendant official." *Id.,* 457 U.S. at 813-814, 102 S.Ct. at 2736 (citing *Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980)).

II.  Second, the District Court compounded its first error, by making Appellants' burden effectively insurmountable, in ruling that qualified immunity defeated all claims unless Appellants produced precedent from analogous types of cases with directly analogous facts demonstrating the Constitutional rights alleged to be violated were "clearly established". This impracticable standard is contrary to long standing precedent expressly holding that whether or not a given right is "clearly established" for qualified immunity purposes, revolves entirely around whether the subject officers had fair

6

notice that what they were doing was unconstitutional, as opposed to a scavenger hunt through the law books to find a case on all fours. *United States v. Lanier,* 520 U.S. 259, 270-271 117 S.Ct. 1219, 1227 (1997) ["[t]he qualified immunity test is simply the adaptation of the fair warning standard to give officials (and, ultimately, governments) the same protection from civil liability and its consequences [] that individuals have traditionally possessed in the face of vague criminal statutes."]. The District Court failed to discuss, much less make findings, as to whether despite any dearth of precedent with sufficiently analogous facts, that Appellees nevertheless had fair notice that their acts were unconstitutional.

III.    Third, the District Court erred in ruling that Appellants failed to prove that Appellees were not entitled to qualified immunity, despite Appellants indeed producing analogous case law demonstrating Appellees violated a "clearly established" Constitutional right, even under the District Court's own erroneously over strict standard.

## STANDARD OF REVIEW

*De novo* review is the proper standard of review as to whether the District Court erred in entering the Order of Dismissal and Judgment of Dismissal. In *Fancher v. Barrientos,* 723 F.3d 1191, 1199 (10th Cir. 2013), this Court held: "we review the district court's denial of a summary judgment motion asserting qualified

7

immunity de novo. (citing *Dodds v. Richardson*, 614 F.3d 1185, 1192 (10th Cir.2010).”; *see also; Estate of Valverde v. Dodge,* 967 F.3d 1049, 1060 (10th Cir. 2020) [We review de novo the denial of a qualified-immunity motion for summary judgment, applying the same standard the district court should apply. (citing *Rieck v. Jensen,* 651 F.3d 1188, 1191 (10th Cir. 2011)).”].

The District Court ruled that the doctrine of qualified immunity barred Appellants’ claims as a matter of law.[2] App. 205-227. Specifically, the Order of Dismissal states that Appellants failed to meet their burden to prove that the Constitutional rights they allege were violated by Appellees, were “clearly established”, sufficient to overcome qualified immunity. App. 218-224, 14-20 and 226-227.

The District Court went on to enter a dismissal of Appellants’ excessive force claims under the Fourteenth and Fourth Amendments respectively, on the grounds that: “Plaintiffs ‘failed to meet their burden of pointing to clearly established law for any violation of the Fourteenth Amendment.’ (citation)”, and that there was no authority presented that: “[w]ould [] have put the officers on notice that their conduct … would violate Plaintiffs’ clearly established Fourth

---

[2] The District Court also overruled Appellants’ objections to certain factual findings in the Recommendation, none of which are at issue in this appeal. App. 224-226.

Amendment constitutional rights in the context of a car chase of potentially armed felony suspects by law enforcement officers. (citation)" App. 218 and 221.

Importantly, in finding that Appellants had failed to satisfy the "clearly established" prong of qualified immunity, the District Court found controlling that Appellants did not produce authority with factual circumstances on all fours with another case involving excessive force claims arising from a car chase of suspected felons by police:

> "As concluded in the Recommendation, ***what is determinative here is Plaintiffs' 'failure to cite binding authority from a car chase case*,**' which is 'fatal to their opposition of qualified immunity.' (citation) The Recommendation concluded that '[o]n that basis alone, Plaintiffs have failed to meet their burden, and Defendants are entitled to qualified immunity.' (citation)" (emphasis added) App. 223.

This despite the District Court concluding there were undoubtedly issues of material fact that would have otherwise precluded the summary judgment motion it ultimately granted on qualified immunity grounds:

> "Upon *de novo* review of the motions for summary judgment and the record evidence, … the Court is skeptical whether, absent the qualified immunity issues discussed herein, there would remain no disputes of fact that would be suitable for a jury - … However, even if the Court were to find in favor of Plaintiffs and conclude that these disputes of fact raised material issues as to whether the officers' conduct was unconstitutional, this could not be sufficient to defeat summary judgment because Plaintiffs have not borne their burden on the second prong of the qualified immunity analysis, as discussed above." App. 226.

9

*De novo* review of the District Court's above-described rulings is appropriate. This is because this appeal seeks reversal of the Order of Dismissal, which was entirely based upon the District Court's conclusion that despite likely material issues of fact, Appellants had not borne their burden of proving that the Constitutional violations alleged against Appellees, were "clearly established" as required to defeat qualified immunity.

## ARGUMENT

Qualified immunity is an affirmative defense designed to limit the civil damages liability of public actors in certain situations. As its title states, qualified immunity is not an absolute defense. Rather, as explained in nearly every decision discussing the doctrine for the past forty years, qualified immunity is an affirmative defense that "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). As the Supreme Court identified in another decision discussing the qualified immunity doctrine, when government officials abuse their offices: "action[s] for damages may offer the only realistic avenue for vindication of constitutional guarantees." *Harlow v. Fitzgerald*, 457 U.S. 800, 814, 102 S.Ct. 2727, 2736 (1982) ("*Harlow*").

The District Court below committed reversible error on no less than three grounds. First, the Order of Dismissal imposed the evidentiary burden upon Appellants, of proving that Appellees were not entitled to qualified immunity. Second, the District Court effectively rendered that burden insurmountable, by ruling that qualified immunity defeated all claims, unless Appellants produced precedent from analogous types of cases with directly analogous facts. Third, the District Court ruled that Appellants failed to prove that Appellees were not entitled to qualified immunity, despite Appellants indeed producing authority with analogous case law, even under the District Court's erroneously over strict standard. All three elements of the District Court's ruling compel reversal by this Court, separately and independently.

I.    **THE DISTRICT COURT ERRED BY RULING THAT APPELLANTS HAD THE BURDEN OF PROVING APPELLEE OFFICERS WERE NOT ENTITLED TO QUALIFIED IMMUNITY**

In 1982, the Supreme Court issued its opinion in *Harlow, supra,* 457 U.S. at 800, 102 S.Ct. at 2727. *Harlow* is a watershed decision on the elements of qualified immunity, that clarified and defined the burden of pleading and proving that affirmative defense as follows: "Qualified or 'good faith' immunity is an affirmative defense that must be pleaded by a defendant official." *Id.,* 457 U.S. at 813-814, 102 S.Ct. at 2736 (citing *Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980) ("*Gomez*")). The Circuit Courts have followed the principle

11

that qualified immunity is an affirmative defense ever since. *Ringuette v. City of Fall River,* 146 F.3d 1, 4 (1ˢᵗ Cir. 1998) ["Qualified immunity is an affirmative defense."]; *Schechter v. Comptroller of City of New York,* 79 F.3d 265, 269-270 (2ⁿᵈ Cir. 1996) ["Qualified immunity is an affirmative defense that must be pled and proved by the defendant."]; *Gray v. Bell,* 712 F.2d 490, 495-496 (D.D.C. 1983) ["Qualified immunity remains an 'affirmative defense that must be pleaded by a defendant official, …'" (citing *Harlow, supra,* 102 S.Ct. at 2737)].[3]

Two years before *Harlow,* the Supreme Court decided *Gomez*, where it also held that a police agent defendant bore the burden of proving the affirmative defense of qualified immunity in a 42 U.S.C. § 1983 action against him:

> "Since qualified immunity is a defense, the burden of pleading it rests with the defendant. See Fed.Rule Civ.Proc. 8(c) (defendant must plead any "matter constituting an avoidance or affirmative defense"); 5 C. Wright & A. Miller, Federal Practice and Procedure § 1271 (1969). It is for the official to claim that his conduct was justified by an objectively reasonable belief that it was lawful. We see no basis for imposing on the plaintiff an obligation to anticipate such a defense by stating in his complaint that the defendant acted in bad faith." *Gomez, supra.,* 446 U.S. at 640-641, 100 S.Ct. at 1924.

For no less than forty years the Supreme Court has thus held, again and again, that qualified immunity is an affirmative defense, and as such, the burden of proving it is necessarily upon the defendant asserting it. *Harlow, supra,* 457 U.S. at

---

[3] *See also: McGhee v. Draper,* 564 F.2d 902, 913 (10ᵗʰ Cir. 1977) ["the burden of pleading the qualified immunity defense and of making an affirmative showing that it was applicable was on the defendants,"].

12

813-814, 102 S.Ct. at 2736; *Gomez, supra,* 446 U.S. at 640-641, 100 S.Ct. at 1923-1924; *see also:* Federal Rules of Civil Procedure, Rule 8(c) ["defendant must plead any matter constituting an avoidance or affirmative defense"]; 5 Wright & Miller (4th Ed.), *Federal Practice and Procedure,* § 1271 (1969). Put another way by an authoritative treatise: "While the burden of going forward with evidence may shift to the plaintiff after the defendant has introduced some evidence, the ultimate burden of proof remains on the defendant." 2 Nahmod (2022), *Civil Rights & Civil Liberties Litigation: The Law of Section 1983*, § 8.1.

Decisions from the Circuit Courts also hold to the Supreme Court-established rule that qualified immunity is an affirmative defense requiring the burden to be carried by the defendant asserting it. In *Alexander v. Alexander*, 706 F.2d 751 (6th Cir. 1983) ("*Alexander*"), the Sixth Circuit vacated a district court's ruling granting the defendant prison officials' summary judgment motion, on the grounds that district court erred by placing the burden of proving qualified immunity defense on wrong party, the plaintiff, as opposed to the defendant claiming the defense:

> "While the plaintiff in a Section 1983 action bears the burden of pleading and proving that the defendant deprived him of a federal right …, ***an assertion of qualified immunity is an affirmative defense which must be pleaded and proved by the defendant official***. [citing *Gomez, supra*, 446 U.S. at 640, 100 S.Ct. at 1923; (other citations omitted)]." (emphasis added) *Alexander, supra,* 706 F.2d at 753-754.

13

The *Alexander* decision was careful to point out that its holding, that

qualified immunity is an affirmative defense with the burden on the defendant to

prove it, was supported by the Supreme Court's decision in *Harlow*:

> "Therefore, in light of *Harlow*'s modification of the qualified
> immunity standard and the Supreme Court's recent instruction to this
> circuit to apply *Harlow* retroactively, *Wolfel v. Sanborn*, 691 F.2d
> 270, 271 (6th Cir.1982), we hold that a Section 1983 defendant retains
> the burden of pleading the qualified immunity defense, *Harlow v.
> Fitzgerald*, 457 U.S. at ——, 102 S.Ct. at 2737, and proving either
> that the law was not clearly established at the time of plaintiff's
> alleged injury, or, if the law was clearly established, that he neither
> knew nor should have known of the relevant legal standard due to
> extraordinary circumstances. *Id*. at ——, 102 S.Ct. at 2739. Since the
> district court placed the burden of proving the qualified immunity
> defense on the wrong party, we remand this case to the district court
> for reconsideration of this issue in light of this opinion." *Alexander,
> supra,* 706 F.2d, at 754.

Also instructive is *Benigni v. City of Hemet,* 879 F.2d 473 (1988),

where the Ninth Circuit held:

> "The argument here centers on who has the burden of proof on the
> immunity defense. It is clear that qualified immunity is an affirmative
> defense (citing *Harlow, supra,* 102 S. Ct. at 2736), and we think it
> equally clear that the burden of proving the defense lies with the
> official asserting it (citing *Harlow, supra,* 102 S. Ct. at 2738.) … A
> number of other circuits have reached the same conclusion, reading
> *Harlow* to say that because qualified immunity is an affirmative
> defense the burden of proving it lies with the defendant just as the
> burden of pleading the defense lies on the defendant, (citations
> omitted)." *Benigni, supra,* 879 F.2d at 479-480.

The Ninth Circuit also followed the Supreme Court standard of

placing the burden of proof on the defendant asserting qualified immunity,

14

in the context of ruling on summary judgment. In *DeNieva v. Reyes,* 966 F.2d. 480 (9th Cir. 1992) ("*DeNieva*"), the court held that the defendant government official bore the burden of proof on the elements of his qualified immunity defense, and as such his declaration in support of his summary judgment motion containing: "[the] bare assertion of objective reasonableness, without any legal or factual support, cannot be construed as establishing either a disputed question of material fact or the existence of qualified immunity as a matter of law." *DeNieva, supra*, 966 F.2d at 486.

Like the Second, District of Columbia, Sixth and Ninth Circuits discussed above (*supra,* at pp. 12-14) - the First, Third, Fourth, Fifth, Seventh and Eighth Circuits all hold to the same rule set forth in *Harlow* and *Gomez,* that the defendant asserting qualified immunity bears the burden of proving it. *DeVasto v. Faherty*, 658 F.2d 859, 865 (1st Cir. 1981) ["Under [*Gomez*], the defendant in a civil rights action has the burden of pleading and proving good faith."; *Thomas v Independence Township,* 463 F.3d 285, 293 (3rd Cir. 2006) ["[t]he burden of pleading a qualified immunity defense rests with the defendant, not the plaintiff."]; *Tanner v. Hardy*, 764 F.2d 1024, 1027 (4th Cir. 1985) ["It is a well established principle that qualified immunity, …, is a matter on which the burden of proof is allocated to the defendants (citing *Harlow*)."]; *Barrett v. Thompson*, 649 F.2d 1193, 1201

15

(5th Cir. 1981) ["Qualified immunity, however, is an affirmative defense; the burden of pleading and proving it rests with the defendant (citing *Gomez*).";  *Chavis v. Rowe*, 643 F.2d 1281, 1288 (7th Cir. 1981) ["this court has not required plaintiffs affirmatively to allege bad faith by the state defendants in order to state a claim under s 1983 (citation). Rather, this court has treated the question of good faith as an affirmative defense which must be pleaded by the defendant in a s 1983 action (citation)."]; *Bauer v. Norris*, 713 F.2d 408, 411 fn.6 (8th Cir. 1983) ["We reject appellant's contention that he was entitled to a finding of good faith immunity as a matter of law. Good faith is an affirmative defense concerning which the defendant bears the burden of pleading and proof."].

In the Order of Dismissal, the District Court repeatedly and without qualification held as a matter of law, that Appellants bore the burden of affirmatively proving Appellees should not be dismissed on qualified immunity grounds: ***"[I]t is plaintiff's burden*** to rebut a defendant's invocation of the qualified immunity defense …" (emphasis added) App. 215; "***Plaintiffs have failed to carry their burden*** to defeat the qualified immunity defense as to the Fourteenth Amendment excessive force claim." (emphasis added) App. 220; "[E]ven if the Court were to find in favor of Plaintiffs and conclude that these disputes of fact raised material issues … this would not be sufficient to defeat

16

summary judgment because ***Plaintiffs have not borne their burden*** on the second

prong of the qualified immunity analysis, …" (emphasis added) App. 226.

The District Court thus erroneously placed the burden on Appellants to

disprove that qualified immunity barred their claims -- a ruling that is antithetical

to the concept of an affirmative defense, adverse to summary judgment principles[4],

and directly contradicted by the forty-year old standard for proving qualified

immunity set forth by the Supreme Court in *Harlow*, *Gomez*, and their progeny

discussed above. For this reason alone, this Court should vacate and reverse the

District Court's Order of Dismissal and Judgment of Dismissal.

///

///

---

[4] Particularly where, as here, the District Court twice ruled that Appellants' claims otherwise raised material issues of disputed fact sufficient to overcome dismissal, as stated in the Order of Dismissal:

> "'Construing these facts as true, the Court finds that plaintiffs have plausibly alleged that defendants violated clearly established law by using deadly force, without being in imminent danger, against plaintiffs, who posed no threat to the officers and were not resisting.' (quoting its earlier ruling on defendants' motion to dismiss by Chief Judge Brimmer)." App. 210;

> "Upon de novo review of the motions for summary judgment and the record evidence, including the video evidence of the events of that evening, the Court is skeptical whether, absent the qualified immunity issues discussed herein, there would remain no disputes of fact that would be suitable for a jury—particularly regarding the circumstances under which various officers discharged their weapons; whether, at those times, Plaintiffs were attempting to surrender and had brought the Malibu to a full stop; and whether and in what direction(s) the Malibu was moving at those times" App. 226.

II.   **THE DISTRICT COURT FURTHER ERRED BY RULING THAT APPELLANTS BORE THE BURDEN OF PRODUCING PRECEDENT IN AN ANALOGOUS TYPE OF CASE, WITH ANALOGOUS FACTS, IN ORDER TO OVERCOME QUALIFIED IMMUNITY**

The District Court compounded its first error of placing the burden on Appellants of disproving qualified immunity, by committing a second reversible error. Namely, by ruling that Appellants failed to satisfy their burden of proving their Constitutional claims were "clearly established" because they failed to produce sufficiently analogous case law, the District Court effectively made that burden insurmountable.

The "clearly established" element of qualified immunity revolves around whether or not the public agent defendant had fair notice that the conduct alleged was unconstitutional. This makes perfect sense on the street level, as it goes without saying that police officers cannot be expected to sift through the "law books" to decide whether their real-time actions and reactions comply with judicial precedent. In *United States v. Lanier,* 520 U.S. 259, 117 S.Ct. 1219 (1997) ("*Lanier*"), the Supreme Court articulated this principle effectively:

> "[t]he qualified immunity test is simply the adaptation of the fair warning standard to give officials (and, ultimately, governments) the same protection from civil liability and its consequences [] that individuals have traditionally possessed in the face of vague criminal statutes. To require something clearer than 'clearly established'

18

would, then, call for something beyond 'fair warning.'" *Id.,* at 520 U.S. 270-271, 117 S.Ct. at 1227.[5]

Since fair notice of what is "clearly established" controls, it is reversible error for a district court to dismiss a plaintiff's Constitutional violation claims on qualified immunity grounds, strictly because analogous case law was not produced by the plaintiff to the court. This is particularly so where, as here, the District Court declined to even consider, much less make findings, as to whether or not the police officer Appellees had fair notice that their conduct was unconstitutional, notwithstanding any absence of case law with sufficiently analogous facts.

In *Mayfield v. Bethards,* 826 F.3d 1252 (10th Cir. 2016) ("*Mayfield*"), this Court rejected the very analysis of "clearly established" employed by the District Court below. In *Mayfield,* this Court affirmed a district court's denial of a police officer's motion to dismiss the plaintiff property owners' 42 U.S.C. § 1983 claim

---

[5] Even in the earlier post-*Marlow* case of *Anderson v. Creighton,* 483 U.S. 635 (1987) ("*Anderson*"), often cited as a pro-defendant case with its focus on a fact-specific and objective analysis of qualified immunity, the Supreme Court was careful to explain that the elements of qualified immunity revolved around the principle of fair notice, as opposed to a post-facto scavenger hunt for factually analogous precedent to determine the "clearly established" element:

> "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, (citation); but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.,* at 639-640.

*See also: Garramone v. Romo*, 94 F.3d 1446, 1451 (10th Cir. 1996) ["In order to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' (citing *Anderson, supra,* 483 U.S. at 640)."

alleging that the officer violated their Fourth and Fourteenth Amendment rights by

killing their pet dog. This Court rejected the police officer defendant's argument

that: "… even if dogs are subject to Fourth Amendment protection, the law was not

clearly established because there was no Supreme Court or Tenth Circuit case on

point." *Id.,* at 1258. This Court went on to hold that although the "clearly

established" prong of qualified immunity:

> "*[g]enerally* requires a Supreme Court or Tenth Circuit decision on
> point or a weight of authority from other courts. (citation). ***The
> question is not whether there is a prior case with precisely the same
> facts, but 'whether the law put officials on fair notice that the
> described conduct was unconstitutional.'*** (citing *Pauly v. White,* 814
> F.3d 1060, 1075 (10th Cir. 2016)). And we have cautioned that
> defining a right too narrowly risks making recovery against a public
> official virtually impossible because only 'those rare cases in which a
> precedential case existed which was 'on all fours' factually with the
> case at bar' would abrogate qualified immunity. (citing *Melton v. City
> of Okla. City*, 879 F.2d 706, 729 n.37 (10th Cir. 1989))." (emphasis
> added) *Mayfield, supra,* 826 F.3d at 1258.

Accordingly, prior decisions may well provide important support in

determining whether the facts of a given case merit qualified immunity,

particularly where the parties and the court are lucky enough to find a case on all

fours with the facts at issue. However, nearly every decision discussing the issue is

careful to point out and hold that a defendant *is not* entitled to qualified immunity

by the mere occurrence that a factually analogous case doesn't exist. Indeed, the

Supreme Court unequivocally rejected that concept in *Hope v. Pelzer,* 536 U.S.

730, 122 S. Ct. 2508 (2002) ("*Hope*"). In *Hope*, the Supreme Court reversed the

over narrow qualified immunity standard adopted by the Eleventh Circuit in the

appeal below, which held that judicial precedent must be "materially similar" to

the facts of the case at bar, in order to be considered for the "clearly established"

element of qualified immunity. The *Hope* court held that the Eleventh Circuit's

"materially similar" standard was over narrow and inconsistent with the standard

of the Supreme Court

> "In assessing whether the Eighth Amendment violation here met the
> *Harlow* test, the Court of Appeals required that the facts
> of previous cases be ''materially similar' to Hope's situation.'
> (citation). This rigid gloss on the qualified immunity
> standard, though supported by Circuit precedent, is not consistent with
> our cases. … Our opinion in *Lanier*[6] thus makes clear that ***officials
> can still be on notice that their conduct violates established law even
> in novel factual circumstances***. Indeed, in *Lanier*, we expressly
> rejected a requirement that previous cases be 'fundamentally similar.'
> Although earlier cases involving 'fundamentally similar' facts can
> provide especially strong support for a conclusion that the law is
> clearly established, ***they are not necessary to such a finding***. The
> same is true of cases with 'materially similar' facts. Accordingly,
> pursuant to *Lanier*, the salient question that the Court of Appeals
> ought to have asked is whether the state of the law in 1995 gave
> respondents fair warning that their alleged treatment of Hope was
> unconstitutional" (emphasis added) *Hope, supra,* 536 U.S. at 739-741,
> 122 S. Ct. at 2515-2516.[7]

---

[6] *Lanier, supra,* 520 U.S. at 259, 117 S.Ct. at 1219.

[7] *See also: Ashcroft v. al-Kidd,* 563 U.S. 731, 741, 131 S.Ct. 2074, 2083 (2011):
"We do not require a case directly on point, but existing precedent must have
placed the statutory or constitutional question beyond debate."

This Court followed the *Hope* decision in *Casey v. City of Federal Heights,* 509 F.3d 1278, 1284 (10th Cir. 2007) ("*Casey*"), in relying on the fair notice principle that controls determining whether a given Constitutional violation was "clearly established" for purposes of qualified immunity:

> "The *Hope* decision shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward ***the more relevant inquiry of whether the law put officials on fair notice*** that the described conduct was unconstitutional." (emphasis added)[8]

Moreover, in *Morris v. Noe,* 672 F.3d 1185 (10th Cir. 2012) ("*Morris*"), this Court held that prior factual precedent need not exist at all, as a precondition to defeating qualified immunity in excessive force cases: "we may conclude a constitutional right was clearly established, ***even in the absence of similar prior cases***, if the force is clearly unjustified." (emphasis added) *Id.,* at 1197.

Two years after this Court's holding in *Morris* above, this Court decided *Estate of Booker v. Gomez,* 745 F.3d 405 (10th Cir. 2014) ("*Estate of Booker*"), wherein the principle that a defendant may not be granted qualified immunity upon

---

[8] *See also:* 2 Nahmod (2022), *Civil Rights & Civil Liberties Litigation: The Law of Section 1983*, § 8.12: "All in all, *Hope* was an attempt by the Court to educate the circuits about the practical aspects of the fair notice requirement of qualified immunity and to caution them against too-rigidly applying the clearly settled law standard."

the argument that a published decision had not articulated a violation of a "clearly

established" right upon a precise set of facts, was again reaffirmed as follows:

> "We agree with the Sixth Circuit's analysis, which is consistent with
> Supreme Court law. *See Saucier v. Katz*, 533 U.S. 194, 202–03, 121
> S.Ct. 2151, 150 L.Ed.2d 272 (2001) ("Assuming, for instance, that
> various courts have agreed that certain conduct is a constitutional
> violation under facts not distinguishable in a fair way from the facts
> presented in the case at hand, the officer would not be entitled to
> qualified immunity based simply on the argument that courts had not
> agreed on one verbal formulation of the controlling standard."),
> overruled in part on other grounds by *Pearson v. Callahan*, 555 U.S.
> 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009); see also *Bailey v. Pataki*,
> 708 F.3d 391, 405 (2nd Cir. 2013) ("For a right to be clearly
> established, it is not necessary that courts have agreed 'upon the
> precise formulation of the standard.' " (quoting *Saucier*, 533 U.S. at
> 202, 121 S.Ct. 2151))."). *Estate of Booker, supra,* 745 F.3d at 428.

The Third, Sixth, Seventh, Eighth and Ninth Circuits have all followed the

above-discussed Supreme Court and Tenth Circuit precedent, that fair notice

controls qualified immunity analysis of what is "clearly established", and not

scavenger hunting for factually analogous case law. *Hicks v. Feeney,* 770 F.2d 375,

379-380 (3rd Cir. 1985) ["This circuit recently rejected the strict standard in favor

of a more flexible approach requiring some factual correspondence and demanding

that officials apply well developed legal principles to the instant case (citation

omitted)."]; *Sample v. Bailey,* 409 F.3d 689, 699-700 (6th Cir. 2005) ["[w]e

conclude that the factual context of this case … is sufficiently similar to our body

of case law … so as to give [the defendant police officer] fair warning that

shooting a suspect who was not perceived as posing a serious threat to the officers

or to others is unconstitutional."]; *McDonald by McDonald v. Haskins,* 966 F.2d 292, 295 (7th Cir. 1992) ["In sum, that no precisely analogous case exists does not defeat [the plaintiff's] claim. It would create perverse incentives indeed if a qualified immunity defense could succeed against those types of claims that have not previously arisen because the behavior alleged is so egregious that no like case is on the books."]; *J.H.H. v. O'Hara*, 878 F.2d 240, 243 (8th Cir. 1989) ["In determining whether the legal right at issue is 'clearly established,' this circuit applies a flexible standard, requiring 'some, but not precise factual correspondence' with precedent, and demanding that officials apply general, well-developed legal principles. (citation omitted)"];[9] *Allen v. City & County of Honolulu,* 39 F.3d 936, 939 (9th Cir. 1994) ["[defendant prison official] is not entitled to qualified immunity simply because [plaintiff inmate] cannot produce a case stating that an inmate is entitled to both his constitutional right to use the law library and his right to have outdoor exercise. (citation omitted)."].

Here, the District Court ruled that Appellants' claims were barred due to the "clearly established" prong of qualified immunity being unsatisfied, on the sole

---

[9] *See also: Buckley v. Rogerson,* 133 F.3d 1125, 1129 (8th Cir. 1998): "In order to determine whether a right is clearly established, it is not necessary that the Supreme Court has directly addressed the issue, nor does the precise action or omission in question need to have been held unlawful.".

grounds that Appellants failed to produce authority with sufficiently analogous

facts in the context of car chase of suspected felons:

> "*[W]hat is determinative here is Plaintiffs' 'failure to cite binding authority from a car chase case*,' which is 'fatal to their opposition of qualified immunity.' (citation). The Recommendation concluded that '[o]n that basis alone, Plaintiffs have failed to meet their burden, and Defendants are entitled to qualified immunity.' (citation)." (emphasis added) App. 223.

The District Court repeated and reaffirmed this same over narrow definition

of "clearly established", throughout its Order of Dismissal: "In their Objection,

Plaintiffs point only to *Roska ex rel. Roska v. Peterson,* 328 F.3d 1230, 1243 (10th

Cir. 2003) … However, … [t]hat case *did not involve potentially armed*

*individuals suspected of felony car theft fleeing police in a car chase, as here*."

(emphasis added) App. 219; "[T[he [District] Court agrees with the

Recommendation's conclusion that [the] case law … would not have put the

officers on notice that their conduct … would violate [Appellants'] clearly

established Fourth Amendment constitutional rights *in the context of a car chase*

*of potentially armed felony suspects by law enforcement officers*." (emphasis

added) App. 221.[10]

---

[10] It again bears note that the District Court placed the burden on Appellants to produce case law with insurmountably similar facts, despite twice ruling that Appellants' claims otherwise raised material issues of disputed fact sufficient to overcome dismissal. App., 210 and 226; *see: supra,* at pg. 17, fn 4 above.

Thus under the District Court's entirely impracticable standard, qualified immunity barred Appellants' claims for failure to meet the "clearly established" element, unless Appellants could cite "binding authority from a car chase case" of "potentially armed felony suspects" App. 221 and 223. Yet glaringly absent from the District Court's analysis, is any consideration or analysis of whether Appellees had fair notice that their conduct was unconstitutional, as mandated by the over forty years of authority discussed above. *Supra,* at pp. 18-24. If, as the Order of Dismissal states, no car chase case with facts on all fours with the case at bar existed, -- the question the District Court should have asked but didn't, was whether Appellees nevertheless have fair notice that they were violating Appellants' Constitutional rights by firing 66 bullet shots into a vehicle occupied by three unarmed people who were attempting to surrender and posed no observable threat to the officers?[11] Also of key importance, the Order of Dismissal cited no factually analogous authority holding the Constitutional rights the Appellants claimed Appellees violated ***was not*** "clearly established" either.[12]

_____

[11] Said facts are assumed true for purposes of the District Court's *de novo* review of Appellees' underlying summary judgment motion. *Tolan v. Cotton,* 572 U.S. 650, 651 134 S. Ct. 1861 (2014) ["[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. (citation omitted)."; *compare:* App. 226 [District Court's list of material facts likely in dispute if not for its ruling granting qualified immunity].

[12] Instead the Order of Dismissal dismissed that particular issue altogether, by declining to discuss the arguments in Appellants' briefing that a case relied upon

In sum, the District Court's Order of Dismissal should be reversed, because it defined a "clearly established" Constitutional right so over narrowly as to be effectively insurmountable. It failed to follow the standard the Supreme Court as well as this Court had already held to be the law of the land, that: "The question is not whether there is a prior case with precisely the same facts, but 'whether the law put officials on fair notice that the described conduct was unconstitutional.' (citation omitted)." *Mayfield, supra,* 826 F.3d at 1258. Moreover, the District Court imposed an entirely impracticable standard in the very manner this Court cautioned against in *Mayfield,* that: "risks making recovery against a public official virtually impossible because only 'those rare cases in which a precedential case existed which was 'on all fours' factually with the case at bar' would abrogate qualified immunity. (citation omitted)." *Mayfield, supra*, 826 F.3d at 1258. The Order of Dismissal and Judgment of Dismissal should be reversed by this Court accordingly.

///

///

---

by Appellees in arguing that the subject rights were not "clearly established", *Mullenix v. Luna,* 577 U.S. 7 (2015), was not dispositive: "[w]hether the facts here are exactly 'on all fours' with the facts in *Mullinex* is not determinative." App. 223.

**III.    THE DISTRICT COURT FURTHER ERRED IN FINDING APPELLANTS' CLAIMS WERE BARRED BY QUALIFIED IMMUNITY, BECAUSE INSUFFICIENT AUTHORITY SHOWING THE CONSTITUTIONAL VIOLATIONS ASSERTED WERE "CLEARLY ESTABLISHED", WAS PRODUCED**

As discussed above, the District Court committed no less than two independent errors in dismissing Appellants' claims on qualified immunity grounds. Over and above those errors, the District Court committed a third separate error of law in finding no "clearly established" Constitutional violations by Appellees existed, based upon then-existing case law produced by Appellants and otherwise available.

In order for the District Court to have conducted its analysis of whether Appellants produced sufficiently analogous authority to meet their burden of showing their claims were "clearly established", the District Court necessarily must have assumed certain facts true in the underlying incident: "[t]he Court re-states the factual background only to the extent necessary to address Plaintiffs' Objections. As stated in the Recommendation, these facts are 'either undisputed or supported by the record, when viewed in the light most favorable to Plaintiffs as the non-moving parties.' (citation)." App. 206.

A review of the Order of Dismissal, along with the relevant record cited and discussed therein, results in it being assumed that none of the Appellants were armed or an imminent threat to any of the officer Appellees, and in fact were

28

attempting to surrender as the subject unfolded. Indeed, the District Court in an earlier ruling in the action on Appellees' motions to dismiss on the pleadings, had already adjudicated that, assuming Appellants' allegations true and viewed in the light most favorable to the non-moving party, that it was "clearly established" for qualified immunity purposes that Appellees violated their Constitutional rights by firing dozens of gunshots into a motionless vehicle with unarmed occupants presenting no observable threat:

> "[Chief Judge Brimmer][13] '… finds that plaintiffs have plausibly alleged that defendants violated clearly established law by using deadly force, without being in imminent danger, against plaintiffs, who posed no threat to the officers and were not resisting.' (citing Order Granting In Part And Denying In Part Defendants' Motion To Dismiss (ECF No. 78)[14])." App. 209.

In fact, even the District Court in the Order of Dismissal appealed here, conceded a second time, that disputes of material facts precluding Appellees' summary judgment motions likely existed (but that it declined to consider them due to the District Court's separate determination that Appellants did not satisfy their burden of disproving qualified immunity):

> "Under *de novo* review of the motions for summary judgment and the record evidence, including the video evidence of the events of that evening, the Court is skeptical whether, absent the qualified immunity

---

[13] Chief Judge Brimmer was the previously presiding District Court judge in the action. App. 209.

[14] *See:* App. 13.

issues discussed herein, there would remain no disputes of fact that would be suitable for a jury – particularly regarding the circumstances under which various officers discharged their weapons; whether, at those times, Plaintiffs were attempting to surrender and had brought the Malibu to a full stop; and whether and in what direction(s) the Malibu was moving at those times." App. 226.

The above-described undisputed facts and findings twice-made by the District Court, put Appellees on fair notice that their conduct was unconstitutional.[15] Namely, the Appellee police officers here need not have sifted through law books to possess fair warning that shooting suspects who were trying to surrender and did not pose a discernible threat, was unconstitutional. In *Carr v. Castle*, 337 F.3d 1221 (10th Cir. 2003) ("*Carr*"), this Court settled that very issue, relying on Supreme Court precedent set forth in *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) ("*Garner*")[16]:

> "[t]he issue to be resolved becomes the familiar question of when an officer can use deadly force to apprehend an unarmed fleeing suspect—an issue thoroughly vetted nearly two decades ago in *Tennessee v. Garner*, 471 U.S. 1, 11–12, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). [footnote omitted]. We set out the portions of that pronouncement that … plainly control this case: ¶ Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so....A police officer may not seize an unarmed,

_____

[15] *Lanier, supra,* at 520 U.S. 270-271, 117 S.Ct. at 1227 *Mayfield, supra,* 826 F.3d at 1258; *see supra,* at pp. 18-20.

[16] Of note, *Garner* was cited and discussed in support of Appellants' objections to the Recommendation adopted by the District Court in dismissing their action on summary judgment. App. 77-78 and 221; *see: supra,* at pp. 31-32 below.

nondangerous suspect by shooting him dead.' (citing *Garner,* 471 U.S. at 11-12)." *Carr, supra,* 337 F.3d at 1227.

Eleven years later in *Estate of Booker, supra,* 745 F.3d at 428, this Court again reaffirmed that: "'there undoubtedly is a clearly established legal norm' precluding the use of violent physical force against a criminal suspect or detainee 'who already has been subdued and does not present a danger to himself or others.' (quoting *Harris v. City of Circleville*, 583 F.3d 356, 367 (6th Cir. 2009))."

Moreover, the cases cited by Appellants in their briefing in opposition to Appellees' underlying summary judgment motion, ***did in fact*** involve analogous cases denying police officers qualified immunity, under circumstances analogous to the case at bar. Namely, it is "clearly established" by case law that shooting at a fleeing suspect that poses no imminent threat to pursuing officers, is an unconstitutional application of excessive force. Appellants cited and discussed no less than three decisions by the Supreme Court and this Court collectively, supporting their argument that the Constitutional violations they claimed were "clearly established" precluded Appellees' qualified immunity.

First, Appellants cited and discussed in their objections to the Recommendation adopted by the District Court, the Supreme Court case of

31

*Garner, supra,* 471 U.S. at 1[17]. App. 77-78 and 221. *Garner* involved a suspect who was shot in the back of the head while climbing over a fence on foot after instruction from the officer to halt, where the Supreme Court held:

> "The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. … A police officer may not seize an unarmed, nondangerous suspect by shooting him dead. *Id.,* at 11-12.

Appellants also cited in support of their objections to the Recommendation[18], this Court's decision in *Vette v. K-9 Deputy Sanders,* 989 F.3d 1154 (10th Cir. 2021) holding:

> "Even if justification for some use of force existed prior to Mr. Vette's arrest, 'the justification disappeared when [Mr. Vette] was under the officers' control.' (citing *Perea v. Baca*, 817 F.3d 1198, 1204 (10th Cir. 2016) [denying qualified immunity to officers for using a taser on a man who had already been arrested])." *Vette, supra,* 989 F.3d at 1170-1171.

Finally, Appellants cited[19] the analogous case of *Cavanaugh v. Woods Cross City,* 625 F.3d 661, 663-667 (10th Cir. 2010), where this Court held that the

---

[17] The same *Garner* decision relied upon by this Court in *Carr*, discussed above (*supra,* at pg. 30).

[18] App. 79.

[19] App. 79, 137 and 222.

officer defendant did not have qualified immunity when he: "discharged [a] Taser into Ms. Cavanaugh's back without warning" while she was walking toward her front door and thereby posed no observable threat to the officer.

The authority discussed in this section III, and in particular the Supreme Court and Tenth Circuit authority cited in support of Appellants' arguments objecting to the District's Court adoption of the Recommendation, more than satisfied that Appellees had fair notice (i.e. it was "clearly established") that you can't shoot or apply force to a fleeing suspect that poses no discernable imminent threat to you, without violating the Constitution. As such, even under the District Court's erroneously strict qualified immunity standard, Appellants did affirmatively produce sufficiently analogous authority to trump Appellees' qualified immunity. The District Court's Order of Dismissal and Judgment of Dismissal must be reversed for this third reason as well.

///

///

## CONCLUSION

For the reasons set forth above, the District Court's Order of Dismissal and Judgment of Dismissal should be reversed and vacated by this Court.

Date: December 28, 2022

Barnes Law

/s/ Robert E. Barnes
Robert E. Barnes
700 S. Flower Street, Suite 1000
Los Angeles, CA 90017
Telephone: (310) 510-6211
Email: robertbarnes@barneslawllp.com

*Attorneys for Appellants*

**STATEMENT OF COUNSEL AS TO ORAL ARGUMENT**

Appellants respectfully request oral argument to assist this Court in

determining the issues presented by this appeal.

## CERTIFICATE OF COMPLAINCE

This Brief complies with the type-volume requirements of Federal Rule of Appellate Procedure 32(a) because it contains 9,360 words.

This Brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a) because it was prepared in 14-point font using a proportionally spaced typeface.

/s/ Robert E. Barnes
ROBERT E. BARNES

DECEMBER 28, 2022

**CERTIFICATE OF DIGITAL SUBMISSION, ANTIVIRUS SCAN, AND PRIVACY REDACTIONS**

I certify, pursuant to the Tenth Circuit's CM/ECF User's Manual, that the attached "APPELLANTS' OPENING BRIEF", as submitted in digital form via CM/ECF, has been scanned for viruses using the most recent version of a commercial virus scanning program and is free of viruses.

I further certify that any hard copies submitted are exact copies of the document submitted electronically, and that all required privacy redactions have been made.

/s/ Robert E. Barnes
ROBERT E. BARNES

DECEMBER 28, 2022

## CERTIFICATE OF SERVICE

I certify that on December 28, 2022, the foregoing "APPELLANTS' OPENING BRIEF" was filed electronically with the Clerk of Court using the Court's CM/ECF system. I further certify that all parties required to be served have been served.


/s/ Robert E. Barnes
ROBERT E. BARNES

DECEMBER 28, 2022

# ATTACHMENTS
**[10th Cir. R. 28.2(C)(5)]**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-01871-RMR-MEH

MARTA SANCHEZ,
THE ESTATE OF STEPHANIE LOPEZ, and
DOMINIC MARTINEZ,

      Plaintiffs,

v.

ANTHONY GUZMAN, individually,
LUKE MCGRATH, individually,
JOSEPH CARNS, individually, and
BRIAN MARTINEZ, individually,

      Defendants.

_____

### RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

_____

**Michael E. Hegarty, United States Magistrate Judge**.

      Before the Court are the motions for summary judgment filed by Defendants Anthony Guzman, Luke McGrath, and Joseph Carns (together, "Littleton Defendants") (ECF 144) and Defendant Brian Martinez (ECF 146). The motions are fully briefed and have been referred to this Court for disposition. The Court finds that oral argument would not materially assist in their adjudication. For the following reasons, the Court respectfully recommends granting the motions.

### **<u>BACKGROUND</u>**

      The Littleton Defendants responded to a dispatch that informed them of a reported carjacking with a potentially armed suspect. Marta Sanchez was the driver of the suspected stolen vehicle, a Chevy Malibu, and Stephanie Lopez and Dominic Martinez were passengers in that vehicle. When the Littleton Defendants encountered the Malibu, they pursued the vehicle while

A1

Ms. Sanchez failed to yield. Using a Pursuit Intervention Technique ("PIT maneuver"), the Littleton Defendants were able to briefly stop the Malibu. To evade capture, the Malibu fled the scene, which prompted some of the officers to shoot at the vehicle. The chase resumed, which again was briefly terminated by the use of a PIT maneuver. Undeterred, the Malibu escaped police capture once more, and additional shots were fired by the officers. At the third and final stop of this chase, Ms. Sanchez lost control of the vehicle, which skidded to a stop. Before she could get the car moving again, one of the officers used his vehicle to ram the Malibu. Officer Martinez joined the Littleton Defendants at this stop. Eventually surrounded by officers again, Ms. Sanchez made one final attempt at escape. A last round of gunfire ended that plan.

Through the course of that evening, Ms. Sanchez was shot multiple times, and Ms. Lopez was fatally shot. Mr. Martinez jumped out of the car (unbeknownst to the officers) at some point during the chase. Ms. Sanchez, Mr. Martinez, and the Estate of Ms. Lopez filed suit on June 27, 2019, alleging violations of their Fourth and Fourteenth Amendment rights for excessive force. ECF 1. Following a ruling on motions to dismiss by Chief Judge Philip A. Brimmer, the only remaining claims are those against the Littleton Defendants and Officer Martinez. ECF 78. After a tumultuous discovery period with no less than six discovery conferences, the Littleton Defendants and Officer Martinez have moved for summary judgment on all remaining claims. ECF 144; ECF 146.

## STANDARDS OF REVIEW

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). A court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter

A2

of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the moving party has the burden of proof—the plaintiff on a claim for relief or the defendant on an affirmative defense— his[, her, or its] showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)). "In other words, the evidence in the movant's favor must be so powerful that no reasonable jury would be free to disbelieve it. Anything less should result in denial of summary judgment." *Id.* at 1154 (quoting 11 Moore's Federal Practice, § 56.40[1][c] (Matthew Bender 3d Ed. 2015)). Only evidence for which the content and substance are admissible may be considered when ruling on a motion for summary judgment. *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1210 (10th Cir. 2010).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in his complaint but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."); *see also Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting

A3

*Celotex*, 477 U.S. at 324); *see Mountain Highlands, LLC v. Hendricks*, 616 F.3d 1167, 1170 (10th Cir. 2010) ("On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [its] case in order to survive summary judgment.") (quoting *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007)). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## STATEMENT OF UNDISPUTED MATERIAL FACTS

On the surface, the parties' briefings would seem to indicate that this case is rife with genuine issues of material fact. However, the evidence removes reasonable disputes as to the *material* facts. In particular, the video evidence of each of the three stops is particularly insightful into what happened on the night in question. When the video evidence contradicts the parties' versions of events, the Court adheres as closely as possible to the video evidence. *See Carabajal v. City of Cheyenne, Wy.*, 847 F.3d 1203, 1207 (10th Cir. 2017) ("[W]e cannot ignore clear, contrary video evidence in the record depicting the events as they occurred."). In doing so, the Court is mindful that all evidence should be viewed in the light most favorable to Plaintiffs. *Id.* With that understanding, the following are the Court's findings of material facts that are relevant to the Court's analysis and either undisputed or supported by the record, when viewed in the light most favorable to Plaintiffs as the non-moving parties.

1.    Just before midnight on the evening of June 29, 2017, the Littleton Defendants were on-duty with the Littleton Police Department when they received a dispatch report that a white Chevy Malibu had been carjacked by four individuals and that one of the suspects was armed and had

A4

fired a shot at or near the victim's head. ECF 144-1, Ex. A at ¶¶ 1–2; ECF 144-2, Ex. B at ¶¶ 1–2; ECF 144-3, Ex. C at ¶¶ 1–2; ECF 144-4, Ex. D at ¶ 10.

2.      The Littleton Defendants, in full police uniform and each driving a fully marked police SUV, began responding to the location of the call, which had been reported at a Dunkin Doughnuts, near the 4700 block of W. Mineral Avenue, in Littleton. Ex. A at ¶ 3; Ex. B at ¶ 3; Ex. C at ¶ 3; Ex. D at ¶ 1.

3.      As the Littleton Defendants proceeded southbound on Santa Fe Drive, they observed the suspect Malibu driving northbound on Santa Fe, near the 6200 block. Ex. A at ¶ 4; Ex. B at ¶ 4; Ex. C at ¶¶ 4–5.

4.      Though unknown to the officers, there were only three suspects in the vehicle at that time. Ms. Sanchez was driving, Ms. Lopez was in the front passenger seat, and Mr. Martinez was in the backseat. ECF 144-5, Ex. E at 190:3–10; ECF 144-6, Ex. F at 114:23–25.

5.      After turning around, the Littleton Defendants began following the Malibu with lights and sirens activated. The suspects did not yield. Ex. A at ¶¶ 5–7; Ex. B at ¶¶ 4–6; Ex. C at ¶¶ 6–7; Ex. E at 205:2–9. Mr. Martinez estimated that the Malibu was driving "at least" seventy-five miles per hour. ECF 172-6, Ex. V at 9:43:10–9:43:25 (conventionally submitted material). Given the totality of these circumstances, the Littleton Defendants were given authorization by their commander to initiate a pursuit. Ex. A at ¶¶ 5–7; Ex. B at ¶¶ 4–6; Ex. C at ¶¶ 6–7; Ex. E at 205:2–9.

6.      Officer Carns, who was leading the pursuit at that time, observed that the suspects ran the red light at Oxford Avenue and narrowly avoided colliding with a motorcycle. Ex. A at ¶ 8; Ex. B at ¶ 6; Ex. C at ¶ 7; Ex. E at 205:10–13. Ms. Sanchez testified that she did not recall almost hitting a motorcycle during the initial pursuit. ECF 158-1, Ex. K at 206:3–7. The suspects then ran the red

light at Dartmouth Avenue and began to weave between lanes. Ex. A at ¶ 8; Ex. B at ¶ 6; Ex. C at ¶ 7; Ex. E at 205:10–13.

7.      Ms. Sanchez admits she ran from police to avoid returning to prison. Ex. E at 201:6–12.

8.      Because the suspects were believed to be armed and given their speeds, erratic maneuvering, and total disregard for multiple traffic control devices, Officer Carns requested and was authorized to perform a PIT maneuver once speeds had decreased. Ex. A at ¶ 8; Ex. B at ¶ 6; Ex. C at ¶ 8.

9.      As they continued north on Santa Fe and approached Arkansas Avenue, the Malibu appeared to skid and decelerate. Officer Carns, intending to stop the vehicle and end the pursuit, performed the PIT maneuver at this time, causing the Malibu to spin roughly 170 degrees and come to rest, facing in a southeast direction on Santa Fe. Ex. A at ¶ 8; Ex. B at ¶ 7; Ex. C at ¶ 8. These events were captured on video. ECF 149, Ex. G-1 (conventionally submitted material); ECF 149, Ex. G-2 (conventionally submitted material).

10.     To prevent the suspects from escaping, Officers Carns and Guzman positioned their vehicles to the southwest and south of the Malibu (respectively), while Officer McGrath positioned his vehicle immediately to the north. The Littleton Defendants exited their vehicles with guns drawn and began shouting commands for the suspects to surrender. Given the time of night, they could not see into the Malibu's passenger compartment. Ex. A at ¶¶ 9–11; Ex. B at ¶ 8; Ex. C at ¶¶ 9–10; Ex. G-1; Ex. G-2; ECF 158-2, Ex. L at 120:1–13; ECF 158-3, Ex. M at 38:12–20, 61:4–7; ECF 158-4, Ex. N at 30:24–31:17.

11.     The Malibu came to a complete stop after the PIT maneuver in the intersection of Santa Fe and East Arkansas. Ex. G-1; Ex. L at 118:3–14; Ex. N at 28:16–20; Ex. M at 35:5–18, 37:18–25.

Ms. Sanchez placed the car in park, Ex. K at 204:10–22, 208:6–21, and all three Plaintiffs put their hands up in the air. Ex. L at 120:8–19, 121:15–17, 122:10–23, 123:1–13; Ex. K at 209:8–210:7.

12.     Officer Guzman was the first person to fire on the vehicle. Ex. A at ¶ 31; Ex. E at 210:14–211:5; ECF 172-4, Ex. N-2 at 35:6–12. Officer Guzman fired in fear for his life. Ex. A at ¶ 13. Officer Guzman did not fire until the vehicle started moving. Ex. G-1; Ex. G-2. At that point, Officer McGrath, who was then facing the Malibu's driver-side door, also opened fire. Ex. C at ¶ 12.

13.     Ms. Sanchez was shot twice (once in the leg and once in the chest) and Ms. Lopez was not hit. Ex. E at 210:23–211:5, 215:1–216:1, 217:17–22. Mr. Martinez alleges he does not know whether he was hit, though he previously told investigators he had not been shot during the entirety of these events. Ex. F at 131:5–22; Ex. V at 9:53:50–9:54:00. Based on the video evidence, Officer Guzman was not in a position to shoot Ms. Sanchez in the leg until after it started driving away from the scene. Ex. G-1; Ex. G-2.

14.     Instead of stopping, the Malibu fled eastbound on Arkansas Avenue. The Littleton Defendants returned to their vehicles and continued the pursuit, with Officer Guzman as the lead vehicle. Ex. A at ¶ 16; Ex. B at ¶¶ 9–10; Ex. C at ¶ 14; Ex. G-1; Ex. G-2.

15.     Plaintiffs turned northbound onto Cherokee Street and proceeded toward Arizona Avenue. They then turned left and began heading north on Cherokee Street, then east on Louisiana Avenue, and eventually north on Bannock Street, before making a U-turn on Bannock and driving back toward Louisiana Avenue. Ex. A at ¶¶ 16–17; Ex. B at ¶ 10; Ex. C at ¶ 14.

16.     Though unknown to officers at the time, Mr. Martinez jumped from the moving vehicle during this portion of the pursuit and had no further involvement with these events. Ex. E at 220:1–7; Ex. F at 130:2–7, 131:10–14.

A7

17.     Officer Guzman executed a PIT maneuver on Bannock Street, between Arizona and Louisiana Avenue. Officers Carns and McGrath attempted to trap the suspects by positioning their vehicles immediately to the north and south of the Malibu, respectively. Ex. A at ¶¶ 17–18; Ex. B at ¶ 10; Ex. C at ¶ 15. These events were captured on video. ECF 149, Ex. H (conventionally submitted material).

18.     Officers Carns and Guzman exited their vehicles. Officer Carns made direct eye contact with the suspect in the passenger seat and began yelling commands for her to show her hands. Ex. A at ¶¶ 18–20; Ex. B at ¶ 11; Ex. C at ¶ 15; Ex. H. Ms. Sanchez did not hear officers give any commands. Ex. K at 228:14–16. Ms. Lopez immediately began to look and reach toward the vehicle's floorboard. Officer Carns concluded she was reaching for a gun and took cover behind Officer Guzman's patrol vehicle. Officer Carns could not see Officer Guzman from this location. Ex. A at ¶¶ 18–20; Ex. B at ¶ 11; Ex. C at ¶ 15; Ex. H. However, Officer Carns never saw a weapon at the second stop or at any time during the pursuit. ECF 158-5, Ex. O at 130:13–19, 145:19–20.

19.     The Malibu began to quickly reverse toward Officer Guzman and ultimately bounced over the curb. Ex. H. In fear of his life, Officer Guzman fired two rounds through the rear windshield, toward the driver's seat. Ex. A at ¶¶ 19–20; Ex. C at ¶ 15.

20.     Because Officer Carns had just observed the vehicle bounce, he believed the suspects had run over Officer Guzman. Ex. B at ¶ 11. Officer Carns fired five rounds through the rear windshield as fast as he could. *Id.* at ¶¶ 12–13. One of those rounds struck Ms. Lopez in the head. *Id.* at ¶¶ 12, 16; Ex. E at 221:22–222:4, 228:4–13. The vehicle then proceeded southbound on Bannock Street, toward Louisiana Avenue, hitting a parked car in the process. Ex. H. The officers resumed the pursuit. Ex. A at ¶ 20; Ex. B at ¶ 13.

21.     As Ms. Sanchez drove south on Bannock St., the Malibu lost traction and spun approximately 45 degrees to the right. ECF 149, Ex. I-1 (conventionally submitted material). The Malibu came to a complete stop on the right side of Bannock St. *Id.* Within moments of stopping, the Malibu's break lights disengaged, and the vehicle began to drive forward. *Id.* Roughly two seconds later, Officer Guzman rammed the Malibu in an attempt to disable it and end the pursuit. *Id.*; Ex. A at ¶¶ 22–23; Ex. C at ¶ 16.

22.     Officers Guzman and McGrath exited their vehicles and began issuing commands for the suspects to surrender. As this was occurring, Officer Martinez of the Englewood Police Department arrived and took up a position south of the Malibu near Louisiana Avenue. Ex. A at ¶¶ 23–24; Ex. C at ¶¶ 16–17; Ex. I-1; ECF 149, Ex. I-2 (conventionally submitted material).

23.     Officer Martinez exited his vehicle after he saw the collision between the Malibu and Officer Guzman's vehicle, and he ran to take cover near the building at the northeast corner of the intersection. ECF 146-1, Martinez Ex. A at 47:17–22, 48:9–14; ECF 148, Martinez Ex. C (conventionally submitted material).

24.     While Officer Martinez was taking cover, the Malibu was idling in the middle of Bannock Street. Martinez Ex. A at 49:10–15; Martinez Ex. C.

25.     From his position beside the building at the northwest corner of the intersection, Officer Martinez could not see inside the building. Martinez Ex. A at 49:16–18, 55:5–10. He did not fire at the Malibu while he was beside the building. *Id.* at 51:10–15.

26.     Officer Martinez remained beside the building for a few seconds and then decided to move from his position to an area behind a van that was on the east side of Bannock Street and out of the line of fire of the Littleton Defendants who had positioned themselves to the north of the Malibu. Martinez Ex. A 50:2–24; Martinez Ex. C; Ex. I-1.

27.     Officer Martinez began to quickly walk along the south edge of the small parking lot in front of the building he had used for cover. Martinez Ex. A at 53:17–20; Martinez Ex. C; Ex. I-1.

28.     He could not see inside the Malibu as he began to move to the east, nor could he tell whether there were any passengers inside the car. Martinez Ex. A at 54:11–13, 54:23–25, 55:5–10, 83:24–84:6.

29.     At that point, and approximately seventeen seconds after being rammed, the Malibu began to move forward and then turn toward the direction of Officer Martinez. Ex. I-2; Ex. A at ¶¶ 24–28; Ex. C at ¶¶ 16–17; Martinez Ex. A 56:19–23, 21:10–20.

30.     In fear of Officer Martinez's life, and for fear of the safety of the public, Officer Guzman fired eleven rounds through the Malibu's rear windshield. Ex. A at ¶ 25; Ex. I-2.

31.     Because the Malibu driving in his direction "freaked [him] out" and caused him to perceive that he was in "a life and death situation," Officer Martinez fired five rounds at the driver's side. Martinez Ex. A at 56:21-3, 57:11–14, 110:20–21, 110:24–11:2, 122:10–13.

32.     The Malibu ultimately did not travel much further, and it stopped at the southern edge of the parking lot. Martinez Ex. A at 73:2–9.

33.     Officer Martinez commanded Ms. Sanchez to put her hands up and when she complied, Officer Martinez called out four or five times to the other officer to stop firing. *Id*. at 79:14–24, 80:5–10.

34.     Officer Guzman did not hear those commands. Ex. A at ¶ 26. Officer Martinez testified that Officer Guzman continued to fire his weapon after the Malibu had stopped. ECF 158-6, Ex. P at 79:25–80:4, 82:13–25, 103:13–24. Officer Guzman declares that he stopped firing his weapon once the Malibu stopped. Ex. A at ¶ 26.

A10

35.    Officers Carns and McGrath did not discharge their firearms at this location. Ex. B at ¶¶ 14–15; Ex. C at ¶¶ 16–17.

36.    In total, the pursuit covered more than six miles and spanned three jurisdictions, including Littleton, Englewood, and Denver. ECF 144-7, Ex. J.

## ANALYSIS

The doctrine of qualified immunity protects from litigation a public official whose possible violation of a plaintiff's civil rights was not clearly a violation at the time of the official's actions. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Because qualified immunity is an immunity from suit, rather than a mere defense to liability, it is effectively lost if a case is erroneously permitted to go to trial. *Id.* at 231; *Ahmad v. Furlong*, 435 F.3d 1196, 1198 (10th Cir. 2006) ("The privilege is an immunity from suit rather than a mere defense to liability.").

When a defendant asserts qualified immunity, the plaintiff has a two-fold burden to overcome the asserted immunity: (1) "rebut the [defendant's] no-constitutional-rights arguments" and (2) "demonstrate that any constitutional violation was grounded in then-extant clearly established law." *Cox v. Glanz*, 800 F.3d 1231, 1245 (10th Cir. 2015) (citing *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009)); *see also Felders v. Malcom*, 755 F.3d 870, 877–78 (10th Cir. 2014) ("[T]he 'record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity.'" (quoting *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001))). An official's conduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear"

A11

that every "reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). To satisfy the clearly established prong of the test, the Tenth Circuit requires that "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010).

Traditionally, there has been a deliberate, two-step process for resolving qualified immunity questions: "First, a court must decide whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right. . . . Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was clearly established at the time of the defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (quoting *Saucier v. Katz*, 533 U.S. 194 (2001) (internal citations and quotation marks removed)). However, the Supreme Court has afforded courts the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236; *see also Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1277 (10th Cir. 2009). Here, the Court begins by examining whether the law was clearly established. In doing so, the court will review the actions of the officers at each of the three stops during the car chase.

## I.     First Stop

The Littleton Defendants received a dispatch report that a white Chevy Malibu had been carjacked by four individuals, with one suspect armed and who had already fired a shot at or near the victim's head. Ex. A at ¶¶ 1–2; Ex. B at ¶¶ 1–2; Ex. C at ¶¶ 1–2; Ex. D at ¶ 10. As the Littleton Defendants proceeded southbound on Santa Fe Drive, they observed the suspect Malibu driving northbound on Santa Fe, near the 6200 block. Ex. A at ¶ 4; Ex. B at ¶ 4; Ex. C at ¶¶ 4–5. After turning around, the Littleton Defendants began following the Malibu with lights and sirens

A12

activated. The suspects did not yield. Ex. A at ¶¶ 5–7; Ex. B at ¶¶ 4–6; Ex. C at ¶¶ 6–7; Ex. E at 205:2–9. A reasonable jury could conclude that the Malibu was travelling in excess of seventy-five miles per hour. Ex. O at 80:13–81:9; Ex. V at 9:43:10–9:43:25. As they continued north on Santa Fe and approached Arkansas Avenue, the Malibu appeared to skid and decelerate. Officer Carns, intending to stop the vehicle and end the pursuit, performed a PIT maneuver at this time, causing the Malibu to spin roughly 170 degrees and come to rest, facing in a southeast direction on Santa Fe. Ex. A at ¶ 8; Ex. B at ¶ 7; Ex. C at ¶ 8.

Officers Carns and Guzman positioned their vehicles to the southwest and south of the Malibu (respectively), while Officer McGrath positioned his vehicle immediately to the north. Given the time of night, they could not see into the Malibu's passenger compartment. Defendants exited their vehicles with guns drawn and began shouting commands for the suspects to surrender. Ex. A at ¶¶ 9–11; Ex. B at ¶ 8; Ex. C at ¶¶ 9–10; Ex. G-1; Ex. G-2; Ex. L at 120:1–13; Ex. M at 38:12–20, 61:4–7; Ex. N at 30:24–31:17. Plaintiffs do not deny that the officers shouted commands. ECF 158 at 4, ¶¶ 10–11; Ex. M at 60:21–24. The Malibu came to a complete stop after the PIT maneuver in the intersection of Santa Fe and East Arkansas. Ex. G-1; Ex. L at 118:3–14; Ex. N at 28:16–20; Ex. M at 35:5–18, 37:18–25. Viewing all facts in the light most favorable to Plaintiffs, Ms. Sanchez placed the car in park, Ex. K at 204:10–22, 208:6–21, and all three Plaintiffs put their hands up in the air. Ex. L at 120:8–19, 121:15–17, 122:10–23, 123:1–13; Ex. K at 209:8–210:7. Again, though, it is undisputed that no officer could see inside the car. ECF 158 at 4, ¶ 11.

Plaintiffs claim that while they had their hands up, the officers indiscriminately fired into the vehicle. Ex. L at 120:8–23. That firing, which resulted in Ms. Sanchez's leg being hit by a bullet, is what prompted Plaintiffs to speed off in the car. *Id.* at 123:14–21; Ex. K at 210:20–

212:24, 218:1–5. However, those contentions are not supported by the evidence in the record, including the video of the incident. *Carabajal*, 847 F.3d at 1207. It is uncontroverted that Officer Guzman was the first person to fire on the vehicle. Ex. A at ¶ 31; Ex. E at 210:14–211:5; Ex. N-2 at 35:6–12. Based on the video evidence, Officer Guzman was not in a position to shoot Ms. Sanchez in the leg until after it started driving away from the scene. Ex. G-1; Ex. G-2. Moreover, Officer Guzman was only standing with his gun pointed for about a second before the Malibu started driving away, and it is undisputed that Officer Guzman shouted a command for the occupants to place their hands in the air and to stop. Ex. M at 60:21–24; Ex. G-1; Ex. G-2. Thus, the record before the Court demonstrates that, in fear for his life, Ex. A at ¶ 13, Officer Guzman did not fire until the vehicle started moving. At that point, Officer McGrath, who was then facing the Malibu's driver-side door, also opened fire. Ex. C at ¶ 12. In addition to her leg, Ms. Sanchez was also shot in her chest. Ex. E at 210:23–211:5, 215:1–216:1, 217:17–22.

## II.  Second Stop

The Malibu fled eastbound on Arkansas Avenue, and the Littleton Defendants returned to their vehicles and continued the pursuit. Ex. A at ¶ 16; Ex. B at ¶¶ 9–10; Ex. C at ¶ 14; Ex. G-1. Plaintiffs turned northbound onto Cherokee Street and proceeded toward Arizona Avenue. They then turned left and began heading north on Cherokee Street, then east on Louisiana Avenue, and eventually north on Bannock Street, before making a U-turn on Bannock and driving back toward Louisiana Avenue. Ex. A at ¶¶ 16–17; Ex. B at ¶ 10; Ex. C at ¶ 14. Mr. Martinez jumped from the moving car, although this was unknown to officers at the time. Ex. E at 220:1–7; Ex. F at 130:2–7, 131:10–14. Officer Guzman executed a PIT maneuver on Bannock Street, between Arizona and Louisiana Avenue. Officers Carns and McGrath attempted to trap the suspects by positioning their

A14

vehicles immediately to the north and south of the Malibu, respectively. Ex. A at ¶¶ 17–18; Ex. B at ¶ 10; Ex. C at ¶ 15.

Officers Carns and Guzman exited their vehicles. Officer Carns made direct eye contact with the suspect in the passenger seat and began yelling commands for her to show her hands. Ex. A at ¶¶ 18–20; Ex. B at ¶ 11; Ex. C at ¶ 15; Ex. H. Ms. Sanchez did not hear officers give any commands. Ex. K at 228:14–16. Ms. Lopez immediately began to look and reach toward the vehicle's floorboard. Officer Carns concluded she was reaching for a gun and took cover behind Officer Guzman's patrol vehicle. Officer Carns could not see Officer Guzman from this location. Ex. A at ¶¶ 18–20; Ex. B at ¶ 11; Ex. C at ¶ 15; Ex. H. However, Officer Carns never saw a weapon at the second stop or at any time during the pursuit. Ex. O at 130:13–19, 145:19–20.

Plaintiffs again assert that the officers fired on the vehicle while it was stationary and pinned by the officers' vehicles. Ex. K at 223:21–226:2. However, the video of the incident does not support that assertion. Ex. H. At the time the Malibu came to rest, it was pinned against a building and was parallel to Bannock Street, at approximately 12:04:15. Ex. H. Three seconds later, at 12:04:18, several muzzle flashes are seen from Officer Guzman's gun, as he fired through the Malibu's rear windshield. Officer Guzman then quickly gets out of the way at approximately 12:04:20, and the Malibu enters the frame less than two seconds later, as it continues to reverse perpendicular to the street—right where Officer Guzman had been standing. *Id.* A reasonable jury could find only that for the Malibu to have been pinned horizontally against a house and in a matter of six seconds to be backing into the street that the car would have been moving at the time Officer Guzman fired his gun. Ms. Sanchez even testified that she did not know if she was completely stopped and that she "wasn't driving fast." Ex. E at 225:11–226:2.

A15

In fear for his life, Officer Guzman fired two rounds through the rear windshield, toward the driver's seat; Officer McGrath did not discharge his firearm. Ex. A at ¶¶ 19–20; Ex. C at ¶ 15; Ex. H. When the Malibu reversed, it bounced over the curb. Ex. H. Because he could not see Officer Guzman, Officer Carns believed that the vehicle had run over Officer Guzman. Ex. B at ¶ 11–13. Officer Carns then fired his weapon through the rear windshield. Ex. B at ¶¶ 11–13. One of the shots struck Ms. Lopez in the head. Ex. B at ¶¶ 12, 16; Ex. E at 221:22–222:4, 228:4–13. Officer Carns claims to have fired the weapon due to "the reverse lights coming right at [him] very fast," Ex. B at ¶ 12, yet the video does not show that Officer Carns was ever in the path of the reversing Malibu. Ex. H. The Malibu then proceeded southbound on Bannock Street, toward Louisiana Avenue, hitting a parked car in the process. Ex. A at ¶ 20; Ex. B at ¶ 13; Ex. H.

### III.   Third Stop

While traveling southbound on Bannock Street, the Malibu started to skid and then momentarily came to a stop on Bannock, perpendicular to the lanes of travel. Ex. A at ¶¶ 22–23; Ex. C at ¶ 16; Ex. I-1; Ex. I-2. At approximately 12:04:33, the Malibu begins to skid and then comes to a temporary stop at 12:04:36. Ex. I-1; Ex. I-2. At 12:04:38, the Malibu's break lights disengaged, and the vehicle began to drive forward. Ex. I-1; Ex. I-2. Two seconds later, at 12:04:40, Officer Guzman rammed the vehicle attempting to end the chase. Ex. I-1; Ex. I-2; Ex. A at ¶ 22. The Malibu break lights only reengaged moments before being rammed. Ex. I-1; Ex. I-2. Officers Guzman and McGrath exited their vehicles and began issuing commands for the suspects to surrender. As this was occurring, Officer Martinez arrived and took up a position south of the Malibu, near Louisiana Avenue. Officer Martinez was off to the side of the Malibu, as it remained facing west. Ex. A at ¶¶ 23–24; Ex. C at ¶¶ 16–17; Ex. I-1; Ex. I-2.

A16

After Officer Guzman rammed the Malibu, he positioned himself by the right rear side of his squad car. Ex. I-1. Ms. Sanchez testified that her foot was "stuck," and she attempted to keep her hands in the air. Ex. K at 235:1–4. Officer Martinez ran to take cover near the building at the northeast corner of the intersection. Martinez Ex. A at 47:17–22, 48:9–14; Ex. I-2. From that position, Officer Martinez could not see inside the Malibu. Martinez Ex. A at 49:16–18, 55:5–10. Officer Martinez remained beside the building for a few seconds and then decided to move from this position to an area behind a van that was on the east side of Bannock St. and out of the line of fire of the Littleton Officers. Martinez Ex. A at 50:2–24. He then quickly walked along the south edge of the small parking lot in front of the building he had used for cover. *Id.* at 53:17–20. At that point, and approximately seventeen seconds after being rammed, the Malibu began to move forward and then turn toward the direction of Officer Martinez. Ex. I-2; Ex. A at ¶¶ 24–28; Ex. C at ¶¶ 16–17. Plaintiffs characterize this movement as rolling at an "idle-ish" speed, citing Officer McGrath's deposition, Ex. N at 71:18–72:16, but it is undisputed that the car moved forward.

In fear of Officer Martinez's life, and for fear of the safety of the public, Officer Guzman fired eleven rounds through the Malibu's rear windshield. Ex. A at ¶ 25; Ex. I-2. Because the Malibu driving in his direction "freaked [him] out" and caused him to perceive that he was in "a life and death situation," Officer Martinez fired five rounds at the driver's side. Martinez Ex. A at 56:21-3, 57:11–14, 110:20–21, 110:24–11:2, 122:10–13. The Malibu ultimately did not travel much further, and it stopped at the southern edge of the parking lot. Martinez Ex. A at 73:2–9. Officer Martinez commanded Ms. Sanchez to put her hands up and when she complied, Officer Martinez called out four or five times to the other officer to stop firing. *Id.* at 79:14–24, 80:5–10. Officer Guzman did not hear those commands. Ex. A at ¶ 26. Officer Martinez testified that Officer Guzman continued to fire his weapon after the Malibu had stopped, Ex. P at 79:25–80:4, 82:13–

A17

25, 103:13–24, but Officer Guzman maintains that he stopped firing his weapon once the Malibu stopped, Ex. A at ¶ 26.

## IV.   Clearly Established Law

The Tenth Circuit has unambiguously emphasized that it is a plaintiff's obligation to cite to cases that satisfy the burden of demonstrating the asserted law is clearly established. *Thomas v. Durastanti*, 607 F.3d 655, 669 (10th Cir. 2010) ("The plaintiff bears the burden of citing to us what he thinks constitutes clearly established law."); *see also Gutierrez v. Cobos*, 841 F.3d 895, 903 (10th Cir. 2016) ("Plaintiffs failed to carry their burden of showing that [the defendants] violated clearly established federal law because their counsel did not make any legal argument in the district court to rebut qualified immunity."); *Rojas v. Anderson*, 727 F.3d 1000, 1004 (10th Cir. 2013) (finding that, although the plaintiff "might well have been able to satisfy us that Defendants' actions violated his clearly established rights," the plaintiff "through his counsel, [has simply] failed to carry the burden assigned to him by law."); *Smith v. McCord*, 707 F.3d 1161, 1162 (10th Cir. 2013) ("[The plaintiff], through his counsel, failed to carry the burden assigned him by law."). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Aldaba v. Pickens*, 844 F.3d 870, 877 (10th Cir. 2016). For the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must support the position. *Doe v. Woodard*, 912 F.3d 1278, 1289 (10th Cir. 2019), *cert. denied sub nom.*, *I.B. v. Woodard*, — U.S. —, 139 S. Ct. 2616 (2019); *Quinn*, 780 F.3d at 1005.

"The question is not whether there is a prior case with precisely the same facts, but 'whether the law put officials on fair notice that the described conduct was unconstitutional.'" *Mayfield v. Bethards*, 826 F.3d 1252, 1258 (10th Cir. 2016) (citation omitted). The Tenth Circuit has

"cautioned that defining a right too narrowly risks making recovery against a public official virtually impossible because only 'those rare cases in which a precedential case existed which was 'on all fours' factually with the case at bar' would abrogate qualified immunity." *Id.* (citation omitted). On the other hand, the Supreme Court has "repeatedly told courts not to define clearly established law at a high level of generality since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Est. of B.I.C. v. Gillen*, 761 F.3d 1099, 1106 (10th Cir. 2014) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). "[S]pecificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an [official] to determine how the relevant legal doctrine . . . will apply to the factual situation the [official] confronts." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). Absent a showing of an analogous circumstance, the Supreme Court has stated that only in a "rare obvious case" will an officer's unlawful actions be sufficiently clear to overcome qualified immunity. *City of Escondido, v. Emmons*, — U.S. —, 139 S. Ct. 500, 504 (2019). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix*, 577 U.S. at 12 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

To meet their burden of pointing to clearly established law, Plaintiffs argue that the Court need not looker further than *Graham v. Connor*, 490 U.S. 386 (1989) and *Tennessee v. Garner*, 471 U.S. 1 (1985). In doing so, they draw the Court's attention to the "sliding scale" of the Tenth Circuit. ECF 158 at 23; ECF 157 at 17. In this context, "'[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.'" *Casey v. City of Federal Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) (quoting *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004)). "Thus, when

an officer's violation of the Fourth Amendment is particularly clear from *Graham* itself, we do not require a second decision with greater specificity to clearly establish the law." *Id*. But the Supreme Court has limited the application of such an approach: "The general rules set forth in *Garner* and *Graham* do not by themselves create clearly established law outside an obvious case." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (cleaned up). If Plaintiffs are relying on *Graham* and *Garner*, then the question becomes whether this case is the "obvious" case.

"[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Pauly v. White*, 874 F.3d 1197, 1214–15 (10th Cir. 2017) (quoting *Graham*, 490 U.S. at 395). This reasonableness standard is an objective one, "judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "In determining the reasonableness of the manner in which a seizure is effected, '[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Scott v. Harris*, 550 U.S. 372, 383 (2007) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). "This balancing test 'requires careful attention to the facts and circumstances of each particular case, including *the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight*.'" *Pauly*, 874 F.3d at 1215 (quoting *Graham*, 490 U.S. at 396) (emphasis in original).

A review of *Casey*, the case cited by Plaintiffs for their reliance on *Graham* and *Garner*, quickly reveals why Plaintiffs' case is not the obvious case. In that case, Mr. Casey went to court to challenge a traffic ticket. 509 F.3d at 1279. He was given his case file to take to the cashier's

A20

window to pay for the ticket. *Id.* His wallet was in his truck, though, so he left the building holding

his file. *Id.* at 1279–80. Under Colorado law, that amounted to a possible misdemeanor. *Id.* at 1280.

An officer learned of this from the court clerk and then left the courthouse to follow Mr. Casey.

*Id.* When the officer found Mr. Casey returning from his truck, he ordered Mr. Casey to return to

the truck and hand over the file. *Id.* When Mr. Casey did not, the officer put Mr. Casey's arm in

an arm-lock and jumped on his back. *Id.* As the two struggled, another officer arrived on scene

and almost immediately fired her Taser at Mr. Casey. *Id.* Shortly thereafter, additional officers

arrived on the scene and brought Mr. Casey to the ground where they repeatedly banged his face

into the concrete. *Id.* A different officer also Tasered Mr. Casey while he was on the ground. *Id.*

The Tenth Circuit found these facts to constitute the obvious case in which *Graham* suffices for

clearly established law since "*Graham* establishes that force is least justified against nonviolent

misdemeanants who do not flee or actively resist arrest." *Id.* at 1285.

Here, the crime at issue was far more severe than simply leaving a courthouse building

with a file. It is undisputed that Plaintiffs were suspected of the felony of auto theft. Colo. Rev.

Stat. § 18-4-409; *see also Shortridge v. Brownlow*, No. 17-cv-02770-MSK-STV, 2020 WL

2322610, at *7 (D. Colo. May 8, 2020) (finding the first *Graham* factor weighed in favor of the

officers because the crime at issue was felony auto theft). Additionally, unlike Mr. Casey, Plaintiffs

actively fled from the police on multiple instances. They did not yield when the officers first started

following the Malibu; Plaintiffs sped off from the scene of the first stop after the use of a PIT

maneuver; Ms. Sanchez quickly reversed and angled the car to escape from the second stop despite

having police vehicles on all sides of the Malibu; and the video shows the car moving and making

a turn as if to attempt escape again at the third stop even after the Malibu was rammed. Finally,

while Mr. Casey did not pose an immediate threat to the safety of officers or others, Plaintiffs

certainly did. Ms. Sanchez drove the Malibu at high rates of speed in order to evade capture. When capture was imminent at each of the stops, she often drove the car in or near the direction of the officers. The Tenth Circuit has said that even a slow-moving car can endanger officer safety. *Thomas*, 607 F.3d at 670–71; *see also Carabajal*, 847 F.3d at 1209–10. Moreover, all of this occurred also in the context of the officers reporting to a carjacking with one suspect purportedly armed. Considering the totality of the circumstances and all three *Graham* factors, the justification that allowed the Tenth Circuit to find *Casey* to be an obvious case—namely, that Mr. Casey was a nonviolent misdemeanant who did not flee—is wholly inapplicable in this case.

Although this case in general does not pose an obvious violation of *Graham*, there are two moments that warrant special consideration. First, Officer Carns fired at the Malibu during the second stop even though he was not directly in its path. Although he may not have been in direct danger, it is undisputed that he believed the Malibu had just run over Officer Guzman when it rolled over the curb. It would thus not be objectively unreasonable for Officer Carns to attempt to save his fellow officer's life. *See Carr v. Tatangelo*, 338 F.3d 1259, 1269 (11th Cir. 2003) (finding an officer "acted in an objectively reasonable manner to the apparent imminent threat to his fellow officer to save his life"). Second, viewing the facts in the light most favorable to Plaintiffs, Officer Guzman shot the Malibu at the third stop after it had stopped moving and the passengers had put their hands up at the command of Officer Martinez. But Officer Guzman did not hear Officer Martinez's commands, and there is no evidence that Officer Guzman saw the Malibu's passengers surrender. Given the two prior stops (and the vehicle's movements just moments before), it was also reasonable for Officer Guzman to expect another attempt at flight. *See Kisela*, 138 S. Ct. at 1152 ("And '[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense,

A22

uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'") (quoting *Graham*, 490 U.S. at 396–87)). At best, Officer Guzman's conduct falls in the "hazy border between excessive and acceptable force." *Mullenix*, 577 U.S. at 18 (cleaned up). Qualified immunity protects such conduct. *Id.*

If *Graham* is not enough for clearly established law, Plaintiffs point to two other cases: *Valdez v. Macdonald*, No. 15-cv-00109-RPM, 2019 WL 1651857 (D. Colo. Apr. 17, 2019) and *Estate of Ceballos v. Husk*, 919 F.3d 1204 (10th Cir. 2019). A quick glance at the years in which these cases were decided suggests that these cases did not define clearly established law at the time of the incidents in this case in 2017. *Kisela*, 138 S. Ct. at 1154 (rejecting reliance on a case "because a reasonable officer is not required to foresee judicial decisions that do not yet exist in instances where the requirements of the Fourth Amendment are far from obvious"). Plaintiffs acknowledge as much, arguing that "[w]hile these decisions occurred after [this case's] use of force, the reasoning from these cases identify established law that predates June 29, 2017, that would have placed all these Defendant officers on notice that their conduct was a violation of clearly established constitutional rights." ECF 158 at 24; ECF 157 at 19. More specifically, Plaintiffs focus on both *Valdez* and *Husk*'s reliance on *Allen v. Muskogee*, 119 F.3d 837 (10th Cir. 1997).

In *Allen*, Mr. Allen left his home with guns and ammunition to go to his sister's house after an altercation with his wife and children. *Id.* at 839. The altercation was reported to the authorities, and the police department held a squad meeting at which this information was disseminated. *Id.* Sometime later, a 911 call was made from the sister's house indicating that Mr. Allen was threatening suicide. *Id.* An officer went to the house where he saw Mr. Allen sitting in the driver's seat of a vehicle with a gun in his right hand. *Id.* The officer repeatedly told Mr. Allen to drop the gun. *Id.* Two other officers arrived on scene, after which the original officer reached into the

A23

vehicle to seize the gun while a second officer held Mr. Allen's left arm. *Id.* The third officer attempted to open the passenger side door. *Id.* In response, Mr. Allen pointed the gun toward the officer at the passenger door, who ducked and moved behind the vehicle. *Id.* Mr. Allen then swung the gun toward the other officers, at which point gunfire was exchanged, resulting in Mr. Allen's death. *Id.* The entire encounter lasted approximately ninety seconds. *Id.* The Tenth Circuit found that there were genuine issues of material fact which prevented the entry of summary judgment in favor of the officers. *Id.* at 840.

As an initial matter, it is important to note that there is no indication that the decision in *Allen* was in the context of a qualified immunity defense. *Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001). "[T]he defendants' summary judgment motion was, therefore, judged under the typical summary judgment standard, which requires a lesser showing by the plaintiff." *Id.* Assuming that it does provide some precedential value in the qualified immunity analysis, the facts of *Allen* are too materially different to create clearly established law. At a base level, *Allen* does not concern chasing a vehicle at high speeds. In fact, Mr. Allen never even attempted to flee from the police. The entire encounter occurred in one location within a short-time span; in contrast, the Plaintiffs in this case caused the officers to confront rapidly evolving scenarios in multiple places, all while being in control of a vehicle which could cause harm to the officers or others. Because of these material differences, a reasonable officer would not understand *Allen* to govern his or her conduct in this case.

For clearly established law, the Court is not looking for precedent with the exact facts at issue in this case. *Mullenix*, 577 U.S. at 12 ("We do not require a case directly on point . . . ."). But make no mistake, the inquiry into clearly established law in the Fourth Amendment context is an extremely fact-intensive one. *City of Tahlequah, Okla. v. Bond*, 142 S. Ct. 9, 12 (2021) ("But the

A24

facts of *Allen* are dramatically different from the facts here."); *Kisela*, 138 S. Ct. at 1153–54 (comparing the facts of cases relied on by the Ninth Circuit and finding material differences); *Brosseau v. Haugen*, 543 U.S. 194, 200 (2004) (describing the relevant inquiry as "whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight"); *Carabajal*, 847 F.3d at 1211 ("Such cases , however, are too factually distinct to speak clearly to the situation [the officer] confronted."). For that reason, and as explained below, Plaintiffs' failure to cite binding authority from a car chase case is fatal to their opposition of qualified immunity. True, *Valdez* is such a case, but it is a decision reached after the conduct at issue in this case, and it is a single, unpublished district court opinion that cannot demonstrate clearly established law. *Cummings v. Dean*, 913 F.3d 1227, 1244 (10th Cir. 2019) (noting that "even assuming that [a single, unpublished district court opinion] is entitled to any consideration at all in the clearly-established-law analysis, that consideration would be minimal"). Moreover, that case fails to cite *Mullenix*, an important precedent discussed below, which calls into question its usefulness as persuasive authority.

In sum, none of the cases cited by Plaintiff demonstrate the existence of clearly established law that squarely governs the specific facts and particularized conduct at issue in this case. On that basis alone, Plaintiffs have failed to meet their burden, and Defendants are entitled to qualified immunity. However, the Court would be remiss if it did not address caselaw conspicuously absent from Plaintiffs' briefing. In particular, the Supreme Court's ruling in *Mullenix v. Luna* best demonstrates why the law was not clearly established in this case. In *Mullenix*, a driver of a car fled after being stopped by an officer. 577 U.S. at 8. That officer, later joined by another, chased the driver for roughly eighteen minutes at speeds between 85 and 110 miles per hour. *Id.* While being chased, the driver called dispatch to threaten the officers with a gun he claimed he had. *Id.*

A25

As the chase ensued, other officers set up tire spikes at various locations. *Id.* Trooper Mullenix responded to the situation, intending to set up a spike strip near an overpass. *Id.* at 9. But when he learned of the other spike strip positions, Trooper Mullenix pondered whether shooting at the vehicle would better disable it. *Id.* He asked the dispatcher to inform his supervisor if this would be permissible, but before he received a response, he took a shooting position on the overpass. *Id.* Roughly three minutes later, Trooper Mullenix saw the vehicle approach, and he fired six shots. *Id.* Four of those shots hit and killed the driver. *Id.*

In litigation, the district court denied, Trooper Mullenix's motion for summary judgment on the basis that there were genuine issues of fact as to whether he acted reasonably. *Id.* at 10. The Fifth Circuit affirmed, noting that clearly established rule violated was that an officer may not use "deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others." *Id.* at 12 (cleaned up). The Supreme Court reversed because it "has previously considered—and rejected—almost that exact formulation of the qualified immunity question in the Fourth Amendment context." *Id.* Instead, "[t]he relevant inquiry is whether existing precedent placed the conclusion that Mullenix acted unreasonably" when he "confronted a reportedly intoxicated fugitive, set on avoiding capture through high-speed vehicular flight, who twice during his flight had threatened to shoot police officers, and who was moments away from encountering an officer at Cemetery Road." *Id.* at 13–14. The Supreme Court answered in the negative, conclusively stating that it "has thus far never found the use of deadly force in connection with a dangerous car chase to violate the Fourth Amendment, let alone to be a basis for denying qualified immunity." *Id.* at 15 (citing *Scott v. Harris*, 550 U.S. 372 (2007) and *Plumhoff v. Rickard*, 572 U.S. 765 (2014)).

The analysis in *Mullenix* leaves little doubt that the appropriate inquiry to determine clearly established law hinges on the facts and conduct at issue. The Supreme Court specifically seems to distinguish dangerous car chase cases from other Fourth Amendment contexts. Moreover, the pronouncement that in those types of cases the Supreme Court has yet to find a violation of the Fourth Amendment weighs heavily against the notion that the law would be clearly established that Defendants in this case violated Plaintiffs' Fourth Amendment rights.[1]

## **CONCLUSION**

During the late hours of July 29, 2017, a tragic (and avoidable) series of events led to the death of Ms. Lopez and the injuries sustained by Ms. Sanchez and Mr. Martinez. By choosing to flee, Plaintiffs endangered the lives of themselves, the responding officers, and the public. To mitigate that danger, the Littleton Defendants and Officer Martinez decided to use deadly force. The question is whether that use of force constituted a violation of Plaintiffs' clearly established rights. Without commenting on whether such actions were in-fact constitutional violations, Plaintiffs have failed to meet their burden to point to clearly established law. On that basis alone, all Defendants should be entitled to qualified immunity. Accordingly, the Court respectfully recommends **granting** both the Littleton Defendants and Officer Martinez's motions for summary judgment [filed February 4, 2022; ECF 144 and 146] and entering summary judgment in their favor on all claims.[2]

---

[1] The Court notes that Plaintiffs only cited to cases concerning violations of the Fourth Amendment. To the extent, any of Plaintiffs' Fourteenth Amendment claims survive in light of *Torres v. Madrid*, 141 S. Ct. 989 (2021), they have failed to meet their burden of pointing to clearly established law for any violation of the Fourteenth Amendment.

[2] Be advised that all parties shall have fourteen (14) days after service hereof to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. Fed. R. Civ. P. 72. The party filing objections must specifically identify those findings or recommendations to which the objections are being made. The District Court need not consider frivolous, conclusive, or general objections. A party's failure to file such written objections to

Respectfully submitted this 29th day of July, 2022, at Denver, Colorado.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge

---

proposed findings and recommendations contained in this report may bar the party from a *de novo* determination by the District Judge of the proposed findings and recommendations. *United States v. Raddatz*, 447 U.S. 667, 676-83 (1980); 28 U.S.C. § 636(b)(1). Additionally, the failure to file written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy may bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted or adopted by the District Court. *Duffield v. Jackson*, 545 F.3d 1234, 1237 (10th Cir. 2008) (quoting *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991)).

A28

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Regina M. Rodriguez**

Civil Action No. 1:19-cv-01871-RMR-MEH

MARTA SANCHEZ, et al.,

     Plaintiffs,

v.

ANTHONY GUZMAN, et al.,

     Defendants.

---

**ORDER**

---

This matter is before the Court on the Recommendation of United States Magistrate Judge, ECF No. 179, entered by Magistrate Judge Michael E. Hegarty on July 29, 2022. The Recommendation addresses the Motions for Summary Judgment filed in this case: (1) the Littleton Defendants' Motion for Summary Judgment, ECF No. 144, and (2) Defendant Brian Martinez's Motion for Summary Judgment, ECF No. 146, which were filed on February 4, 2022 and which this Court referred to Magistrate Judge Hegarty on February 8, 2022, ECF No. 150. Magistrate Judge Hegarty recommends granting summary judgment on all of the remaining claims in this case, and for the reasons stated below, the Court OVERRULES the objections filed by Plaintiffs, ECF No. 180; ACCEPTS and ADOPTS the Recommendation; GRANTS the Motions for Summary Judgment; and DISMISSES Plaintiffs' claims WITH PREJUDICE.

A29

## I.      BACKGROUND

The factual background of this case is more fully laid out in the Recommendation.
*See* ECF No. 179 at 1–2, 4–11.   The Recommendation's statement of facts is
incorporated herein by reference.   *See* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).
Accordingly, the Court re-states the factual background only to the extent necessary to
address Plaintiffs' Objections.   As stated in the Recommendation, these facts are "either
undisputed or supported by the record, when viewed in the light most favorable to
Plaintiffs as the non-moving parties."   ECF No. 179 at 4.

On the evening of June 29, 2017, Defendant Officers Anthony Guzman, Joseph
Allen Carns, and Luke McGrath were on duty with the Littleton Police Department.   Just
before midnight, they received a dispatch report that a white Chevy Malibu had been
carjacked by four individuals.   One of the suspects was armed and had fired a shot near
the victim's head, according to the dispatch report.   This constituted felony auto theft in
violation of Colorado Revised Statute § 18-4-409.   *See id.* at 21.   The officers responded
to the report in full police uniform, each driving a fully marked police SUV.   They observed
the suspect Malibu driving northbound on Santa Fe Drive.   There were three suspects in
the vehicle at that time: Plaintiffs Marta Sanchez and Dominic Martinez, as well as
decedent Stephanie Lopez, whose Estate proceeds as the third Plaintiff in this action.
The officers began to follow the Malibu with lights and sirens activated, but the suspects
did not yield.

Plaintiff Martinez estimated that the Malibu was driving "at least" seventy-five miles
per hour.   The suspects ran red lights at Oxford Avenue and Dartmouth Avenue and

A30

began to weave between lanes.  Officer Carns observed the suspects narrowly avoid colliding with a motorcycle, but Plaintiff Sanchez testified that she did not recall almost hitting a motorcycle.  Officer Carns requested and was authorized to perform a Pursuit Intervention Technique ("PIT") maneuver once speeds decreased, in order to stop the Malibu.  Eventually, the Malibu appeared to skid and decelerate, and at that time, Officer Carns performed the authorized PIT maneuver.  The Malibu spun roughly 170 degrees and came to rest.  This was the first of three "stops" that took place during this pursuit, all of which were captured on video that has been submitted to the Court.  Officer Brian Martinez of the Englewood Police Department joined the other Defendant officers at the third stop, in response to their dispatch call for assistance.

In total, the pursuit of the suspects in the Malibu covered more than six miles and spanned three jurisdictions, including Littleton, Englewood, and Denver.  Plaintiff Sanchez, who was the driver, was shot multiple times.  Plaintiff Lopez, who was in the front passenger seat, was fatally shot.  Plaintiff Martinez, who was in the back seat, jumped out of the moving vehicle at some point during the chase between the first and second stops, unbeknownst to the officers, and had no further involvement.  He alleges that he does not know whether he was hit but had previously told investigators that he had not been shot during the entirety of the events.  Plaintiffs argue that there are disputes of fact as to what took place at each of the three stops, including the circumstances under which the various officers exerted force and fired their weapons at Plaintiffs during those stops, that preclude summary judgment.  The facts regarding each of those stops are more fully laid out in the Recommendation, and Plaintiffs' arguments regarding their

A31

disputes of fact are more fully laid out below.  However, Plaintiffs have failed to satisfy the "clearly established" prong of the qualified immunity analysis. Therefore, as stated below, these disputes of fact are not material to the motions for summary judgment at issue.

The Plaintiffs filed their Civil Rights Complaint with Request for Trial by Jury in this case on June 27, 2019.  ECF No. 1.  On January 17, 2020, Plaintiffs filed an Amended Civil Rights Complaint with Request for Trial by Jury ("Amended Complaint"), which is the operative complaint in this case.  ECF No. 54.  The Amended Complaint brought the following claims:

1. Excessive force in violation of the Fourth and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983, against Defendants Guzman, McGrath, Carns, and Martinez, except that only Plaintiffs Sanchez and the Estate of Stephanie Lopez—not Plaintiff Martinez—brought this claim against Defendant Martinez, *id.* ¶¶ 74–96; *see id.* at 13 n.2;

2. Monell violations, pursuant to 42 U.S.C. § 1983, against the City of Littleton; Defendant Doug Stephens, Police Chief of Littleton, in his official capacity; Defendant John Collins, Police Chief of Englewood, in his official capacity; and the City of Englewood, *id.* ¶¶ 97–106;

3. Negligence against all Defendants, *id.* ¶¶ 107–13; and

4. Wrongful death, pursuant to Colorado Revised Statute §§ 13-21-201, 13-21-202, by Plaintiff the Estate of Stephanie Lopez against Defendants Guzman, McGrath, Carns, and Martinez, *id.* ¶¶ 114–16.

A32

On January 31, 2020, Defendants filed a Motion to Dismiss, ECF No. 62, and Partial Motion to Dismiss, ECF No. 61.  On September 30, 2020, the previously presiding district judge, Chief Judge Brimmer, granted in part and denied in part these motions.  ECF No. 78 at 28–29.  Chief Judge Brimmer dismissed Plaintiffs' third claim of negligence as untimely filed and dismissed the fourth claim of wrongful death because the Estate of Stephanie Lopez failed to timely file notice of the claim pursuant to the Colorado Governmental Immunity Act ("CGIA").  *Id.* at 7–9, 29.  Chief Judge Brimmer also found that Plaintiffs had failed to state a *Monell* claim and dismissed that claim, as well.  *Id.* at 21–27, 29.

As for the excessive force claim arising under the Fourth Amendment, Chief Judge Brimmer noted that, "[t]o state a claim of excessive force under the Fourth Amendment, a plaintiff must show both that a seizure occurred and that the seizure was unreasonable."  *Id.* at 10 (quoting *Bella v. Chamberlain*, 24 F.3d 1251, 1255 (10th Cir. 1994)).  He found that "plaintiffs ha[d] not sufficiently alleged that they were seized during the first or second stops or that defendants violated clearly established law" and dismissed the excessive force claim, with respect to Defendants Guzman, McGrath, and Carns, "as to the first and second stops."  *Id.* at 14–15.  "Because defendants d[id] not raise any arguments with respect to the third stop, plaintiffs' first claim survive[d] as to the third stop."  *Id.* at 15 n.11.  As such, Chief Judge Brimmer dismissed the claim for excessive force under the Fourth Amendment "without prejudice as to the first and second stops."  *Id.* at 29.  However, he denied the Fourth Amendment motion to dismiss the excessive force claim against Defendant Martinez because it was "based solely on the assumption that Lopez had died

A33

before defendant Martinez arrived at the scene and, as a result, Martinez could not have participated in the seizure of Lopez – an assumption the Court has rejected." *Id.* at 16. Hence, the first claim for excessive force arising under the Fourth Amendment proceeded against Defendants Guzman, McGrath, and Carns only as to the third stop and proceeded against Defendant Martinez, who was only present for the third stop.

As for the excessive force claim arising under the Fourteenth Amendment, Chief Judge Brimmer noted that, "where neither the Fourth nor the Eighth Amendments apply, courts 'turn to the due process clauses of the Fifth or Fourteenth Amendment and their protection against arbitrary governmental action by federal or state authorities.'" *Id.* at 17 (quoting *Porro v. Barnes*, 624 F.3d 1322, 1325 (10th Cir. 2010)); *see also id.* at 18 (quoting *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1243 (10th Cir. 2003)) ("Force inspired by malice or by unwise, excessive zeal amounting to an abuse of official power that shocks the conscience may be redressed under the Fourteenth Amendment.")). The Defendants "argue[d] that plaintiffs have failed to demonstrate that the actions of the defendants who shot into plaintiffs' vehicle were 'conscience-shocking.'" *Id.* at 17–18 (citing ECF No. 61 at 6; ECF No. 62 at 4). However, Chief Judge Brimmer found that the facts "as alleged, demonstrate a degree of outrageousness and harm that could be construed as conscience-shocking depending on the context, to be revealed through further discovery." *Id.* at 19; *see also id.* at 21 ("Construing these facts as true, the Court finds that plaintiffs have plausibly alleged that defendants violated clearly established law by using deadly force, without being in imminent danger, against plaintiffs, who posed no threat to the officers and were not resisting."). Hence, he "f[ou]nd[] that plaintiffs have

A34

stated an excessive force claim under the Fourteenth Amendment." *Id.* at 21. Accordingly, following Chief Judge Brimmer's Order, ECF No. 78, regarding the Motions to Dismiss, ECF Nos. 61, 62, the only claim that proceeded in this case was the first claim for excessive force in violation of the Fourteenth Amendment, as well as the first claim for excessive force in violation of the Fourth Amendment, but only as to the third stop. ECF No. 78 at 28–29.

On July 6, 2021, this matter was reassigned to the undersigned. ECF No. 109. On February 4, 2022, Defendants Carns, Guzman, and McGrath filed a Motion for Summary Judgment, ECF No. 144, as did Defendant Martinez, ECF No. 146. The undersigned referred the motions to Magistrate Judge Hegarty. ECF No. 150. Magistrate Judge Hegarty's Recommendation on the motions for summary judgment was served on the parties on July 29, 2022. ECF No. 179. On August 12, 2022, Plaintiffs timely[1] filed Plaintiffs' Objections to Magistrate's Recommendations on Defendants' Motions for Summary Judgment, ECF No. 180. No other objection has been filed. On August 26, 2022, Defendants filed Responses to Plaintiffs' Objections. ECF Nos. 182, 183.

## II.   LEGAL STANDARD

The Court is required to make a de novo determination of those portions of a magistrate judge's recommendation to which a specific, timely objection has been made, and it may accept, reject, or modify any or all of the magistrate judge's findings or recommendations. 28 U.S.C. § 636(b)(1) ("A judge of the court shall make a de novo

---

[1] As noted in the Recommendation, parties are required to file objections to the Recommendation within fourteen days after its service in order to be entitled to review by a district judge. *See* ECF No. 179 at 27 n.2 (citing Fed. R. Civ. P. 72).

A35

determination of those portions of the report or specified proposed findings or recommendations to which objection is made."); Fed. R. Civ. P. 72(b)(3) ("The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to."); *see United States v. One Parcel of Real Property*, 73 F.3d 1057, 1060 (10th Cir. 1996) ("[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review.").

### III.   ANALYSIS

Plaintiffs enumerate five objections to the Recommendation:

- First, Plaintiffs object to the Recommendation's factual findings regarding the first stop, stating that "the Recommendation makes an unsubstantiated factual determination that 'Officer Guzman did not fire until the vehicle started moving,'" noting that the Recommendation "cit[ed] video exhibits" but "disregarded sworn testimony from the Plaintiffs."  ECF No. 180 at 7–10.

- Second, Plaintiffs object to the Recommendation's factual findings regarding the second stop, stating that the Recommendation makes "conclusions of fact that are directly contradicted by the defendants' own testimony and video evidence"—first, "that Carns fired five rounds through the rear windshield as the car was reversing"; second, that "the Recommendation again rejected Sanchez's testimony that Officers fired on the Malibu while they sought to surrender and were stopped at the second location"; and third, that the Recommendation "provides no record cite for" its finding that "Lopez immediately began to look and reach toward the Malibu's

floorboard at the second stop," such that the officers could infer that she was reaching for a weapon, and that this finding is contradicted by Officer Carns' testimony.  *Id.* at 10–13.

- Third, Plaintiffs object to the Recommendation's factual findings regarding the third stop, stating that the video footage "directly contradicts" the Recommendation's finding that "the Malibu began to move forward and then turn toward the direction of Officer Martinez."  *Id.* at 13.

- Fourth, Plaintiffs object to the Recommendation's conclusion that there was no clearly established law to support the second of Plaintiffs' two-pronged burden to withstand a qualified immunity defense.  *See id.* at 13–14.

- Fifth, Plaintiffs object to the fact that the Recommendation explicitly declined to analyze both prongs of Plaintiffs' burden to withstand the qualified immunity defense and instead found that Defendants enjoy qualified immunity based on the second of the two requirements—that there was clearly established law regarding Plaintiffs' constitutional rights at the time of the incident that Defendants violated. *See id.* at 14–15.  In addition, Plaintiffs object to the Recommendation's disposition of their Fourteenth Amendment claims, stating that "[t]he Recommendation fails to analyze a single case cited by the Plaintiffs that supports their Fourteenth Amendment rights were clearly established at the time of the incident."  *Id.* at 15–16.

The Court addresses each objection in turn below, although not necessarily in the order listed above.

A37

A.   The Recommendation's Application of the Second Prong of the Qualified Immunity Analysis

First, the Court may easily dispense with Plaintiffs' objection to the fact that the Recommendation only analyzes the second of the two-pronged qualified immunity test. *See* ECF No. 180 at 3, 13–15.  Plaintiffs cite *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) for the proposition that a court "must conduct a two-part analysis: the constitutional right at issue, and whether it was 'clearly established' at the time of the incident."  *Id.* at 3.  However, not only the case law cited in the Recommendation and numerous other Tenth Circuit and Supreme Court cases, but also Plaintiffs' own cited case law establishes that a court may conduct the qualified immunity analysis in any order it chooses.

In fact, *Pearson* was the case in which the Supreme Court relaxed the previous "rigid order of battle" in a qualified immunity case that required courts to embark on, first, the inquiry of "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right" and, second, "if the plaintiff has satisfied the first step . . . whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." 555 U.S. at 232, 234, 236, *cited in* ECF No. 180 at 3.  The Supreme Court held in that case that, "[o]n reconsidering the procedure . . . , we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory."  *Id.* at 236.  "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Id.*  The Supreme Court reasoned that "[t]here are cases in which it is

A38

plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Id.* at 237.

The Recommendation, itself, pointed out this holding of the Supreme Court in *Pearson* before then proceeding with the "clearly established" prong of the analysis. *See* ECF No. 179 at 12. The Recommendation also cited one of numerous Tenth Circuit cases noting that courts may engage in the two-pronged qualified immunity analysis in whichever order they deem necessary. *See Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1277 (10th Cir. 2009) ("[T]he Supreme Court jettisoned its prior holding that courts in qualified immunity cases must determine whether the plaintiff's constitutional rights were violated before turning to whether the asserted right was clearly established."); *see also, e.g.*, *Ashcroft v. Al-Kidd*, 563 U.S. 731, 735 (2011) ("We recently reaffirmed that lower courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first."); *Weise v. Casper*, 593 F.3d 1163, 1167 (10th Cir. 2010) (quoting *Pearson*, 555 U.S. at 236) ("In their discretion, courts are free to decide which prong to address first 'in light of the circumstances of the particular case at hand.'").

Hence, Plaintiffs' statement of the law—that "[t]here is no case in the United States that allows a court to skip the essential first prong of identifying the constitutional violation at issue before *requiring* a plaintiff to provide clearly established law," ECF No. 180 at 15 (emphasis in original)—is patently wrong. Instead, it is a plaintiff's burden to rebut a defendant's invocation of the qualified immunity defense by establishing *both* that "(1) the defendant violated a constitutional or statutory right and (2) this right was clearly established at the time of the defendant's challenged conduct." *See, e.g.*, *Estate of*

*Valverde ex rel. Padilla v. Dodge*, 967 F.3d 1049, 1058 (10th Cir. 2020).  It is then the Court's prerogative to analyze whichever qualified immunity prong it deems proper first, before moving on to the next prong.  For these reasons, Plaintiffs' objection to the fact that the Recommendation started and completed its analysis with the second of the two requirements that Plaintiffs must meet in order to defeat a qualified immunity defense is OVERRULED.

### B.   The Recommendation's Disposition of the Fourteenth Amendment Claim

Plaintiffs also object that "[t]he Recommendation . . . relegated the analysis of the Plaintiffs' Fourteenth Amendment claims to a Footnote," ECF No. 180 at 15, in which the Recommendation notes that, "[t]o the extent, any of Plaintiffs' Fourteenth Amendment claims survive in light of *Torres v. Madrid*, 141 S.Ct. 989 (2021), they have failed to meet their burden of pointing to clearly established law for any violation of the Fourteenth Amendment," ECF No. 179 at 27 n.1, *quoted in* ECF No. 180 at 15.  Plaintiffs argue that the "Recommendation fails to analyze a single case cited by the Plaintiffs that supports their Fourteenth Amendment rights were clearly established at the time of the incident." ECF No. 180 at 15.

Plaintiffs do not dispute that, as the previously presiding district judge noted in ruling on the motions to dismiss in this case, *see* ECF No. 78 at 16–17, "[s]ubstantive due process analysis is appropriate in cases that involve excessive force where a specific constitutional provision—such as the Fourth or Eighth Amendment—does *not* apply." *Roska*, 328 F.3d at 1243 (emphasis added); *see also Estate of Booker v. Gomez*, 745 F.3d 405, 419 (10th Cir. 2014) ("And when neither the Fourth nor Eighth Amendment

A40

applies—when the plaintiff finds himself in the criminal justice system somewhere between the two stools of an initial seizure and post-conviction punishment—we turn to the due process clauses of the Fifth or Fourteenth Amendment and their protection against arbitrary governmental action by federal or state authorities.").   After the previously presiding district judge allowed Plaintiffs' Fourteenth Amendment claims to survive the motions to dismiss in this case, *see* ECF No. 78 at 21 (dated September 30, 2020), the Supreme Court issued its decision in *Torres*.

In *Torres*, the Supreme Court vacated the Tenth Circuit's decision that the Fourth Amendment's protection against unreasonable seizures did not apply to an excessive force claim where police officers fired their service pistols to stop a suspect from driving away.   141 S.Ct. at 1003.   The Tenth Circuit had reasoned that "'no seizure can occur unless there is physical touch or a show of authority,' and . . . 'such physical touch (or force) must terminate the suspect's movement' or otherwise give rise to physical control over the suspect.'"  *Id.* at 994 (quoting *Torres v. Madrid*, 769 F. App'x 654, 657 (10th Cir. 2019)).  However, the Supreme Court held, instead, that "the application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued."  *Id.* at 1003.   Therefore, "the officers' shooting applied physical force to [Torres'] body and objectively manifested an intent to restrain her from driving away."  *Id.* at 999.   The Supreme Court "[t]herefore conclude[d] that the officers seized Torres for the instant that the bullets struck her."  *Id.*  Given this holding in *Torres*, it is likely that the Fourteenth Amendment would not apply to Plaintiffs' claims here and that the claims should instead be analyzed under the "specific constitutional provision" of

the Fourth Amendment.  *See Roska*, 328 F.3d at 1243; *see also Pauly v. White*, 874 F.3d 1197, 1214–15 (10th Cir. 2017) ("*[A]ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard.") (emphasis and alteration in original).  Hence, as to the Fourteenth Amendment claim, given *Torres*, Plaintiffs would likely be unable to carry their first burden to withstand qualified immunity, which is to establish a violation of a constitutional right.

However, the Court need not reach the issue of whether *Torres* precludes Plaintiffs from carrying their burden under the first prong of the qualified immunity analysis because, even if they could, the Court is bound to follow Tenth Circuit and Supreme Court precedent regarding the Plaintiffs' burden under the second prong of the qualified immunity analysis and therefore agrees with the Recommendation's conclusion that Plaintiffs "failed to meet their burden of pointing to clearly established law for any violation of the Fourteenth Amendment."  *See* ECF No. 179 at 27 n.1.  The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality."  *Mullenix v. Luna*, 577 U.S. 7, 12 (2015).  "The dispositive question is 'whether the violative nature of the *particular* conduct is clearly established.'"  *Id.* (quoting *Al-Kidd*, 563 U.S. at 742) (emphasis in original).  "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'"  *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).  As the Recommendation notes, to show that a defendant violated clearly established law in the second of a plaintiff's two-pronged

burden to withstand qualified immunity, although "[t]he question is not whether there is a prior case with precisely the same facts," a plaintiff must point to law that "put[s] officials on fair notice that the described conduct was unconstitutional." *Mayfield v. Bethards*, 826 F.3d 1252, 1258 (10th Cir. 2016), *quoted in* ECF No. 179 at 18. "The plaintiff bears the burden of citing . . . what he thinks constitutes clearly established law." *Thomas v. Durastani*, 607 F.3d 655, 669 (10th Cir. 2010); *see also Gutierrez v. Cobos*, 841 F.3d 895, 903 (10th Cir. 2016); *Rojas v. Anderson*, 727 F.3d 1000, 1004 (10th Cir. 2013); *Smith v. McCord*, 707 F.3d 1161, 1162 (10th Cir. 2013); ECF No. 179 at 18.

In their Objection, Plaintiffs point only to *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1243 (10th Cir. 2003) as a case that sets forth "the factors required for a Fourteenth Amendment violation." ECF No. 180 at 15. However, the facts of *Roska* do not resemble the facts of this case in any way. *Roska* involved allegations of Fourth and Fourteenth Amendment violations arising from a child being removed from his family and put into protective custody, where school employees and case workers suspected that the child's mother suffered from a "disorder where an individual, usually a mother, inflicts physical harm upon his or her children in order to gain the sympathy and attention of medical personnel." *See* 328 F.3d at 1238. That case did not involve potentially armed individuals suspected of felony car theft fleeing police in a car chase, as here. *Roska*, which in no way involves conduct similar to the conduct at issue here, does not carry Plaintiffs' burden to point to clearly established law.

Nor do any of the cases cited in Plaintiffs' Opposition to Littleton Defendants' Motion for Summary Judgment carry Plaintiffs' burden to point to clearly established law

A43

that the Defendants violated.  *See* ECF No. 158 at 16–17 (citing *Uhrlig v. Harder*, 64 F.3d 567, 573 (10th Cir. 1995) (involving allegations that the decision to terminate a mental hospital's special unit reserved for the criminally insane was reckless and led to the placement in the general hospital population of a patient who killed the plaintiff's deceased wife, a music and activity therapist for the hospital); *Ruiz v. McDonnell*, 299 F.3d 1173, 1178 (10th Cir. 2002) (involving allegations that a child suffered severe head injuries consistent with violent shaking while at a day care that should not have been licensed by the Colorado Department of Human Services because the owners had a history of domestic violence and the day care lacked public liability insurance)); *see also* ECF No. 180 at 15 (citing ECF No. 158 at 13–15).  Plaintiffs have failed to carry their burden to defeat the qualified immunity defense as to the Fourteenth Amendment excessive force claim.

C.   **The Recommendation's Conclusion that Plaintiffs Failed to Point to Clearly Established Law to Withstand the Qualified Immunity Defense as to the Fourth Amendment Claim**

Regarding the Fourth Amendment claim, Plaintiffs object that "the Recommendation's assertion that there is no case law that would have placed the Defendant's [sic] on notice of their unconstitutional actions is inaccurate."  ECF No. 180 at 13.  First, Plaintiffs argue that they have "provided ample case law from the Tenth Circuit, the Supreme Court, and sister circuits that placed the Defendants' [sic] directly on notice of constitutional violations for their uses of excessive force."  *Id.* at 13–14 (citing *id.* at 3–6).  To the extent Plaintiffs provide any case law for this purpose in their Objection that they did not raise in their original briefing on the motions for summary judgment, any

argument that such case law provides clearly established law that fulfills their burden to withstand a qualified immunity defense is waived.  *See, e.g.*, *Gilbert v. United States Olympic Committee*, 423 F. Supp. 3d 1112, 1125 (D. Colo. 2019) (Arguello, J.) (citing *Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996)) ("Parties may not raise in their objections any novel arguments that they did not raise before the magistrate judge.  Such arguments are deemed waived.").  Further, to the extent Plaintiffs provide case law that was decided after the events of the evening of June 29–30, 2021, such case law did not provide a "clearly established" constitutional right at that time.  *See, e.g.*, *Ullery v. Bradley*, 949 F.3d 1282, 1291 (10th Cir. 2020) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)) ("To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent.").

As for the remaining case law Plaintiffs cite in their Objection, the Court agrees with the Recommendation's conclusion that this case law would not have put the officers on notice that their conduct at the third stop would violate Plaintiffs' clearly established Fourth Amendment constitutional rights in the context of a car chase of potentially armed felony suspects by law enforcement officers.  *See Tennessee v. Garner*, 471 U.S. 1, 4 (1985) (involving a suspect who was shot in the back of the head while climbing over a fence on foot after instruction from officer to halt); *Graham v. Connor*, 490 U.S. 386, 389 (1989) (involving officers' conduct during an investigatory stop when a diabetic individual suffering from the onset of an insulin reaction "got out of the car, ran around it twice, and finally sat down on the curb, where he passed out briefly" and officers "rolled [him] over on the sidewalk and cuffed his hands tightly behind his back," "lifted [him] up from behind,

carried him over to [the] car, and placed him face down on its hood," "shoved his face down against the hood of the car," and "threw him headfirst into the police car"); *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1206, 1211, 1212 (10th Cir. 2017) (holding that officer was entitled to qualified immunity where, after noticing that he was being followed by a police vehicle with its lights and sirens activated, an individual "drove for several blocks" and then pulled over; the officers stepped in front of the vehicle; the vehicle began to move forward; the officer fired two rounds from his shotgun and severely injured the driver; and the officers removed the driver from the vehicle); *Morris v. Noe*, 672 F.3d 1185, 1190, 1198 (10th Cir. 2012) (holding that officers did not have qualified immunity where, on foot, they "lunge[d] towards [Morris] and put their hands on his shoulders, twisted him around and ran him into the bushes . . . throwing him to the ground"); *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 663–67 (10th Cir. 2010) (holding that officer did not have qualified immunity where he "discharged [a] Taser into Ms. Cavanaugh's back without warning" while she was walking toward her front door); *Casey v. City of Federal Heights*, 509 F.3d 1278, 1279–80, 1282–86 (10th Cir. 2007) (holding that officers were not entitled to qualified immunity when they "grabbed, tackled, Tasered, and beat[]" an individual "suspected of innocuously committing a misdemeanor [taking his case file out of the courthouse while retrieving money from his car to pay a fine], who was neither violent nor attempting to flee"); *Scott v. Henrich*, 39 F.3d 912, 914–16 (9th Cir. 1994) (affirming summary judgment in favor of defendant officers where officers responded to reports of a man firing gunshots at a nearby address; banged on the door and yelled "something to the effect of 'Police, police officers, open up'"; an individual opened the

A46

door with a "long gun" and pointed it at them; and the officers fired shots, one of which fatally wounded the individual).  These cases do not provide clearly established law regarding Plaintiffs' Fourth Amendment rights during a car chase that Defendants would have violated through the "described conduct" here.  *See Mayfield*, 826 F.3d at 1258; *see also Mullenix*, 577 U.S. at 12.

Second, Plaintiffs argue that "the Recommendation's reliance on *Mullenix v. Luna* is flawed as that case is clearly distinguishable from the present matter."  ECF No. 180 at 14.  According to Plaintiffs, unlike in *Mullenix*, which involved a fleeing vehicle that was driving at "speeds between 85 and 110 miles per hour," here, the Malibu was "not moving" when "the officer[s] fired at them" in the first and second stops and when, at the third stop, "Officer Guzman rammed the car at approximately 60 MPH" while it was allegedly not moving and then "Guzman and Officer Martinez fired at [the car] while it was rolling at an 'idle-ish' speed and Guzman kept firing multiple rounds after the Malibu stopped and Officer Martinez shouted at him to cease fire."  *Id.* at 14 (quoting *Mullenix*, 577 U.S. at 8).

However, whether the facts here are exactly "on all fours" with the facts in *Mullenix* is not determinative.  *See Mayfield*, 826 F.3d at 1258.  As concluded in the Recommendation, what is determinative here is Plaintiffs' "failure to cite binding authority from a car chase case," which is "fatal to their opposition of qualified immunity."  ECF No. 179 at 25.  The Recommendation concluded that "[o]n that basis alone, Plaintiffs have failed to meet their burden, and Defendants are entitled to qualified immunity."  *Id.*  The Recommendation simply discussed *Mullenix* because it was "conspicuously absent from Plaintiffs' briefing" and provided additional reasons to find that Plaintiffs had failed to bear

A47

their burden to withstand qualified immunity.  *See id.* at 25–26; *see also Mullenix*, 577 U.S. at 15 ("The Court has thus far never found the use of deadly force in connection with a dangerous car chase to violate the Fourth Amendment, let alone to be a basis for denying qualified immunity.").  Therefore, any distinctions Plaintiffs may point to between their case and *Mullenix* do not change the Court's conclusion that the Magistrate Judge's recommendation to grant summary judgment in favor of Defendants is a sound determination of the facts and the law.

Third, Plaintiffs argue that the Recommendation imparted "improper deference to the Defendants' proposed facts, while disregarding contradictory video evidence, weighing the Plaintiffs' credibility against them, and disregarding the defendants' sworn testimony when it conflicts with the Magistrate's opinion of the video evidence."  ECF No. 180 at 14.   This argument refers to Plaintiffs' specific objections regarding the Recommendations' findings of fact, which are addressed below.

### D.    The Recommendation's Findings of Fact as to the Three Stops

Plaintiffs' remaining objections raise issues regarding the Recommendations' findings of fact of what occurred during each of the three stops that took place on the night in question.  As stated above, Plaintiffs object to the Recommendation's factual findings as follows:

1. Regarding the first stop, Plaintiffs argue that the Recommendation "makes an unsubstantiated factual determination that 'Officer Guzman did not fire until the vehicle started moving'" but that this finding contradicts Plaintiffs' sworn testimony that the officer opened fire while the Malibu was stopped and in park

A48

and the Plaintiffs' hands were in the air.  ECF No. 180 at 7–8.  Plaintiffs argue that "[w]hether Sanchez was driving at the time Guzman started firing is a disputed material fact that cannot be resolved at summary judgment."  *Id.* at 10.

2.  Regarding the second stop, Plaintiffs argue that the Recommendation makes "conclusions of fact that are directly contradicted by the defendants' own testimony and video evidence."  *Id.* at 10.  First, "that Carns fired five rounds th[r]ough the rear windshield."  *Id.*  Plaintiffs argue that "[t]he video explicitly reflects that the only time Carns would be in the position to shoot the front seat passenger through the 'rear windshield' is . . . when the Malibu is driving down the street – not after it reversed over the curb."  *Id.* at 11.  Second, Plaintiffs argue that:

> The Recommendation found that Officer Guzman fired at least three shots . . . , moved behind his car . . . , then the Plaintiff's car is seen reversing and moving . . . , approximately 4-6 seconds after Guzman began firing at the car.  The Magistrate admits that the video does not show the Malibu moving until four seconds after the alleged shots . . . .  If the video shows no vehicle moving prior to Guzman's three shots, the reasonable inference is that the vehicle is not moving prior to those shots – and thus creating no danger for anybody.

*Id.* at 11–12.  Third, Plaintiffs argue that the Recommendation "provides no record cite" for its finding that at the second stop, "Lopez immediately began to look and reach toward the Malibu's floorboard," giving rise to the inference that she was reaching for a weapon.  *Id.* at 12–13.  Plaintiffs argue that this finding is "directly contradicted by the shooter's, Carns, sworn testimony . . . that at no

A49

point during the pursuit did he see Lopez present a threat of harm, and he did not see the passenger move." *Id.*

3. Finally, regarding the third stop, Plaintiffs argue that "the video footage contradicts [the] finding" in the Recommendation that "the Malibu began to move forward and then turn toward the direction of Officer Martinez." *Id.* at 13 (quoting ECF No. 179 at 10 ¶ 29; *id.* at 17). According to Plaintiffs, Martinez "is clearly seen in the video walking towards the Malibu firing his weapon," while neither he nor the other officers were heard giving commands to the occupants of the vehicle. *Id.* Plaintiffs further argue that Guzman's affidavit stating that he was in fear of Officer Martinez's life and of the safety of the public when he fired eleven rounds through the Malibu's windshield is merely "self-serving." *Id.*

Upon *de novo* review of the motions for summary judgment and the record evidence, including the video evidence of the events of that evening, the Court is skeptical whether, absent the qualified immunity issues discussed herein, there would remain no disputes of fact that would be suitable for a jury—particularly regarding the circumstances under which various officers discharged their weapons; whether, at those times, Plaintiffs were attempting to surrender and had brought the Malibu to a full stop; and whether and in what direction(s) the Malibu was moving at those times. However, even if the Court were to find in favor of Plaintiffs and conclude that these disputes of fact raised material issues as to whether the officers' conduct was unconstitutional, this would not be sufficient to defeat summary judgment because Plaintiffs have not borne their burden on the second prong of the qualified immunity analysis, as discussed above. Therefore,

A50

Plaintiffs' attempts to raise disputes of fact are not material to the Court's determination that summary judgment is warranted, and these objections are OVERRULED.

## IV.   CONCLUSION

For the reasons stated above, it is

ORDERED that Plaintiffs' Objections to Magistrate's Recommendations on Defendants' Motions for Summary Judgment, ECF No. 180, are OVERRULED; it is

FURTHER ORDERED that the Recommendation of United States Magistrate Judge, ECF No. 179, is ACCEPTED and ADOPTED; it is

FURTHER ORDERED that the Littleton Defendants' Motion for Summary Judgment, ECF No. 144, and Defendant Brian Martinez's Motion for Summary Judgment, ECF No. 146, are GRANTED; and it is

FURTHER ORDERED that Plaintiffs' remaining claims and this case are DISMISSED WITH PREJUDICE.

DATED:  August 30, 2022

BY THE COURT:

_____

REGINA M. RODRIGUEZ
United States District Judge

A51

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Regina M. Rodriguez**

Civil Action No. 19-cv-01871-RMR-MEH

MARTA SANCHEZ, et al.,

      Plaintiffs,

v.

ANTHONY GUZMAN, et al.,

      Defendants.

---

**FINAL JUDGMENT**

---

In accordance with the orders filed during the pendency of this case, and pursuant to Fed. R. Civ. P. 58(a), the following Final Judgment is hereby entered.

Pursuant to the Order Accepting Magistrate Judge's Recommendation entered by Judge Regina M. Rodriguez on August 30, 2022 (ECF No. 184), it is

ORDERED that judgment is entered in favor of the Defendants and against the Plaintiffs. It is

FURTHER ORDERED that Plaintiffs' remaining claims and this case are DISMISSED WITH PREJUDICE.

Dated at Denver, Colorado this 30th day of August, 2022.

FOR THE COURT:
JEFFREY P. COLWELL, CLERK


By:   s/K. Myhaver
     K. Myhaver
     Deputy Clerk

A52